UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| D.B., an individual, by and through his next friend Darlene Whaley | ) ) ) | CIVIL ACTION |
| Plaintiff, | ) ) | No. |
| v. | ) ) | Judge |
| CORRECTHEALTH EAST BATON ROUGE, LLC; THE CITY / PARISH OF EAST BATON ROUGE; SHERIFF SID J. GAUTREAUX III, | ) ) ) ) ) | Magistrate Judge |
| Defendants. | ) ) ) | |

## <u>COMPLAINT</u>

Now comes D.B., an interdicted person with severe Asbergers Syndrome, by and through his next of friend Darlene Whaley and undersigned counsel, who files this Complaint and sues CORRECTHEALTH EAST BATON ROUGE, LLC (hereinafter "CorrectHealth"), SHERIFF SID J. GAUTREAUX III (hereinafter "the Sheriff"), and THE CITY / PARISH OF EAST BATON ROUGE (hereinafter "City/Parish"). Plaintiff, D.B., brings suit against CorrectHealth for injunctive relief, damages (compensatory and nominal), and attorneys' fees and costs under the Louisiana Commission on Human Rights, La. Rev. Stat. Ann. § 51:2231 *et seq*., (hereafter "LCHR"). Plaintiff, D.B., brings suit against the City/Parish and the Sheriff for injunctive relief, damages (compensatory and nominal), and attorneys' fees and costs under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*. ("Americans with Disabilities Act" or "ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq*. ("Rehabilitation Act" or "RA").

## JURISDICTION AND PARTIES

1.  This is an action for injunctive relief, damages, and attorneys' fees/costs pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. §12131 *et seq.* (see also 28 U.S.C. § 2201 and § 2202), and for Plaintiff's claims arising from 29 U.S.C. §794 *et seq.* (Rehabilitation Act). This Court is vested with original jurisdiction pursuant to 28 U.S.C. § 1331 and 1343.

2.  This is also an action for injunctive relief, damages, and attorneys' fees/costs pursuant to the LCHR against CorrectHealth. Plaintiff's claims against CorrectHealth are supplemental to Plaintiff's claims under federal law against the City/Parish and arise from the same operative facts.

3.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the discrimination which is the subject of this action occurred in East Baton Rouge Parish, Louisiana.

4.  Plaintiff, D.B., (hereinafter referred to as "D.B.") is a resident of the State of Louisiana. D.B. is not currently a prisoner and as such is not subject to the Prison Litigation Reform Act.

5.  D.B. is a qualified individual with a disability under the ADA, RA, and LCHR. D.B. is diagnosed with Asperger's Syndrome, which is a congenital autism spectrum disorder. D.B.'s disability is characterized by significant difficulties in social interaction.

6.  D.B. has ongoing difficulty with reading social cues, understanding meaning in social interactions. D.B.'s perception of events, especially social events, is frequently skewed.

7.  Because of his disability, D.B. has limitations in cognitive brain function.

8.    Because of his disability and consequent limitations, D.B. is frequently unable to engage in rational thinking, decision making, and successful social interactions.

9.    Because of his disability and consequent limitations, D.B. frequently engages in repetitive behaviors. D.B. frequently repeats lines from movies and television shows for months or years on end.

10.    Because of his disability and consequent limitations, D.B. frequently and unintentionally engages in what is otherwise considered to be socially inappropriate behavior. For example, D.B. will become obsessed with an individual and make repeated phone calls while repeating the lines from movies and television.

11.    Due to the limitations associated with his disability, D.B. is frequently subject to manipulation and persuasion.

12.    D.B. also suffers from a long-term pattern of abnormal behavior characterized by exaggerated feelings of self-importance. D.B. will typically not self-identify as a person with a disability.

13.    However, D.B. is very much disabled. On October 27, 2005, after numerous Court appearances and the testimony of medical professionals, D.B. was interdicted under Louisiana law. The Court granted curatorship to D.B.'s next of friend in this action, Ms. Darlene J. Whaley.

14.    D.B. has difficulty holding jobs due to poor social interaction, inability to concentrate, and learning disabilities.

15.    D.B. has been taking Lorazapam and Seroquel for over five years for severe anxiety and panic attacks related to his diagnosis of Asperger's Syndrome. D.B.'s physicians have

cautioned D.B. and his family about abrupt withdrawal of these psychiatric medications due to the many problems that can follow abrupt withdrawal, including seizures, heightened anxiety, panic, depression, inability to fall asleep leading to sleep deprivation, and excessive strain to the cardiac system.

16.    D.B. is substantially impaired in several major life activities, as outlined above.

17.    Defendant CORRECTHEALTH EAST BATON ROUGE, LLC is a private entity operating the medical services department at East Baton Rouge Parish Prison (hereinafter "CorrectHealth").

18.    Defendant THE CITY/PARISH OF EAST BATON ROUGE, is the political entity which owns and is responsible for the East Baton Rouge Parish Prison (hereinafter "City/Parish").

19.    Defendant SHERIFF SID J. GAUTREAUX III is the political entity responsible for the inmate classification, inmate security, inmate supervision, and inmate movement at the East Baton Rouge Parish Prison (hereinafter "the Sheriff").

20.    The City/Parish and the Sheriff are public entities and are subject to the ADA and Rehabilitation Act of 1973. At all relevant times, the City/Parish and the Sheriff were the recipient of federal funds.

21.    At all relevant times, CorrectHealth was a private entity operating a place of public accommodation as defined by LA. REV. STAT. ANN. § 51:2232(9) because it is a "place … which is supported directly or indirectly by government funds."

22.    All events giving rise to this lawsuit occurred in the Middle District of Louisiana.

23.    In addition to an award of injunctive relief and compensatory damages, D.B. seeks an award of nominal damages. It is D.B.'s position that an award of nominal damages against

DEFENDANTS, regardless of the amount, would confer significant civil rights to the public as a judgment in his favor would deter DEFENDANTS from discriminating against individuals with disabilities in the future.

### COUNT I
### VIOLATION OF TITLE II OF THE ADA
### AS TO THE CITY/PARISH AND THE SHERIFF

24.    D.B. realleges and reavers paragraphs 1-23 as if they were expressly restated herein.

### The Ongoing Disfunction at the East Baton Rouge Parish Prison.

25.    The City/Parish is the owner of the East Baton Rouge Parish Prison ("EBRPP").

26.    Under Louisiana law, the City/Parish is responsible for funding the prison, providing the physical facility, and providing all medical services.

27.    There has been ongoing disfunction at the EBRPP for years.

28.    Prior to 2014, inmates at EBRPP were transported to Earl K. Long Hospital for medical treatment.

29.    While Earl K. Long Hospital was still in operation, the primary medical function of the City/Parish was simply to transport inmates to Earl K. Long Hospital.

30.    While Earl K. Long Hospital was still in operation, nearly all of the medical care of inmates in the EBRPP  was handled by the hospital, save for "minor ailments."

31.    However, with the closure of Earl K. Long Hospital around 2014, the City/Parish became responsible for the medical care of inmates.

32.    During the transition period in which the City/Parish took over the medical care of prisoners, the interim director in charge of process either retired or quit.

33.    The medical services at the EBRPP were taken over by Emergency Medical Service ("EMS") employees of the City/Parish. These are the individuals who operate and staff

ambulances.

34. The EMS officials working on the transition period reported that additional equipment and medicine were needed in order to care for the inmates.

35. The budget increases required to meet the medical needs of the inmates was "alarming" to William Daniel, the Chief Administrative Officer of the EBRPP.

36. Based on this need, Mr. Daniels solicited a request for proposal and retained Health Management Associations to conduct a study and issue a report on the long-term operation of medical services at the EBRPP.

37. Health Management Associations was one of three organizations that submitted a proposal, and the process in selecting it was completely objective.

38. Employees of EMS were instructed to "make every record available" and "cooperate fully" with Health Management Associations to ensure the best port possible.

39. The authors of the Report conducted a detailed onsite visit spanning from February 23-26, 2016 and interviews with numerous members of prison staff.

40. The authors of the Report also reviewed extensive documentation including EMS Prison Medical Overview, Prison Inmate Rules and Regulations, Medical Intake and Orientation, Pharmacy Reports, and electronic Medical Records.

41. On June 8, 2016 Health Management Associates formally published its report on the East Baton Rouge Parish Prison ("The Report").

42. The Report found a "notable vacancy rate for RN and LPN positions," that the "medical provider staffing is insufficient to meet the needs of the EBR prison population," and that "MH staff (excluding LCSW) are not addressing in-facility needs of inmates."

43.    Further, the Report found that the prison did not even have a full time physician and that the current physician staffing only served a meager 36% of the actual need.

44.    The Report identified that "Physical plant is notably deficient".

45.    The Report identified that the EBRPP "Need sufficient ADA complaint space for population."

46.    The Report determined that the "Health care provided is episodic and inconsistent."

47.    Further, the Report determined that Prison Medical Services suffered from "Lack of Experienced Health Services Administration", noting that the "Interim administrative leader in place dividing time with other duties" and that she was [n]ot experienced in clinic management or corrections health."

48.    The Report determined that "Current leadership not capable of taking EBR Prison where they need to go."

49.    The Report determined that the condition of medical care at the Prison was so bad that there was a need for "an immediate plan for implementation of changes to meet standards of care and minimize risk."

50.    In approximately February of 2016, Ms. Beatrice Stines, as Director of Nurses for Prison Medical Services, made a presentation to the Baton Rouge Metro Council about the EBRPP's need for more supplies and staff.

51.    The decision to make the presentation was a joint decision by the employees of Prison Medical Services.

52.    At the time of the presentation, there were approximately 1,700 inmates in the EBRPP and only 26-30 nurses employed with Prison Medical Services, with five nurses working per

shift.

53. Ms. Stines stated that Prison Medical Services needed "at least double" the amount of nurses it had employed in February 2016.

54. Ms. Stines believed the need for more nurses was impacting patient care because "it was burning out the nurses."

55. Ms. Stines stated that she believed the shortage in staffing lead to more nurses calling in and not coming to work, which left even fewer nurses per shift.

56. Ms. Stines stated Prison Medical Services "lacked equipment and some of the necessary supplies."

57. Ms. Stines said the lack of equipment was an ongoing problem and was a daily concern of the nurses employed by PMS.

58. Various employees, including LaDonna Raine and Ms. Stines described the equipment that was available at this time as "like a bathroom scale" – insinuating that the employees at Prison Medical Services had little more than a bathroom scale at their disposal.

59. Based on this dysfunctional situation, Mr. William Daniels chose to privatize the medical services offered at EBRPP. Despite an initial improvement, however, the current situation is at EBRPP is still highly dysfunctional.

60. This impact of this disfunction is especially acute for persons with psychiatric disabilities. According to Warden Grimes, medical lockdown is for "anybody with medical issues, disciplinary issues, behavior issues. It's just temporary housing."

61. The sheriff's office determines whether a person in medical lockdown is allowed to be out of their cell.

62.    The cells in medical lockdown do not differ in any way from those used to house inmates in lockdown for disciplinary issues.

63.    Inmates in medical lockdown are not released on the yard with general population, but rather are only allowed to go on the tier.

64.    The 'tier' is indoors, meaning prisoners in lockdown are not permitted to go outside.

65.    Unlike other inmates, inmates on disciplinary lockdown or medical lockdown do not receive an equal opportunity to use the telephones, take showers, go outside, or possess personal items.

66.    Therefore, by default, inmates with disabilities at EBRPP are subject to discrimination on the basis of their disability. The facial discrimination against individuals with psychiatric disabilities at the EBRPP is discussed further below.

67.    The City/Parish makes no attempt to accommodate persons with disabilities. In an interrogatory response verified under oath in the case of *Mealy v. Gautreaux et al*, the City/Parish testified that it "does not provide accommodations to offenders incarcerated at East Baton Rouge Parish Prison." U.S.D.C. for the M.D. of La., 3:16-cv-00716-JWD-RLB.

68.    The lack of any policies, procedures, and practices to accommodate individuals with disabilities is also evident by the City/Parish's response to a public records request.

69.    On Tuesday, May 28, 2019, attorney Garret S. DeReus made a public records request to the City/Parish for the following records:

- All policy, procedure, and practice documents pertaining to the screening, evaluation, or processing of inmates with autism or other intellectual disabilities at East Baton Rouge Parish Prison.

- All policy, procedure, and practice documents related to the provision of medical care to inmates with autism or other intellectual disabilities at East Baton Rouge Parish Prison.

- All policy, procedure, and practice documents related to the safe housing of inmates with autism or other intellectual disabilities at East Baton Rouge Parish Prison.

- All policy, procedure, and practice documents related to the prevention of rape of inmates with autism or other intellectual disabilities at East Baton Rouge Parish Prison.

- All studies, reports, evaluations, etc. performed in the last five years related to the rape or abuse of inmates at the East Baton Rouge Parish Prison.

- All logs indicating dates, times, and frequency of reported instances of rape at the East Baton Rouge Parish Prison within the last three years. You may redacted personally identifiable information.

70.    In response to this public records request, the City/Parish could only produce three meager documents. These documents were as follows: (1) a "Intake Retrieving Screening Policy," (2) a blank copy of the "Intake Retrieving Screening Form," and (3) a half-page "Response to Sexual Abuse Policy."

71.    The three documents that were produced by the City/Parish do not explain how an individual with autism should be accommodated, what sort of housing recommendations should be made, what sort of auxiliary aids/services should be provided, steps that should be taken to protect the inmate with autism from abuse, manipulation, or rape, or any other pertinent accommodation procedures.

72.    Quite simply, based on the above, the City/Parish and CorrectHealth are still providing healthcare services at the EBRPP in a state of disfunction.

**D.B's is Taken to the East Baton Rouge Parish Prison During December of 2018 and Defendants Learn of the Nature of His Disability**

73.    On or about December 5, 2018, D.B. was thrust into the culture of disfunction that is the EBRPP.

74.    In a Prison Transport Record which, upon information and belief is completed by an employee of the Sheriff's Office, the first question is: 1. Have you observed any medical

10

problems ☐ No ☐ Yes."

75.    Initially, the box for "No" was checked. However, the form was then revised and the box
       for "Yes" was marked and below that the word "Autistic" was written.

76.    Shortly thereafter, the medical staff completed a "Medical Clearance Form." This form
       included the phrase "Medically cleared for general population/booking". That statement
       was initially checked in an approving manner, but it was subsequently crossed out.

77.    Therefore, by as early as December of 2018, Defendants' staff had notice that D.B. was a
       person with a disability that needed accommodations.

**D.B. is Taken to the EBRPP During April of 2019, He is Subjected to Illegal Discrimination, and**
**He is Raped.**

78.    On April 11, 2019 a warrant was issued to D.B. for improper telephone communications.

79.    Prior to his voluntarily reporting to authorities, D.B.'s attorney advised Ms. Whaley to call
       the medical division of the prison to make arrangements to bring D.B.'s psychiatric and
       other medications.

80.    On April 15, 2019 Ms. Whaley called and spoke to a nurse in the medical department of
       the prison. The nurse told Ms. Whaley to bring D.B.'s medications, in separate vials,
       currently filled to the "guard shack" where D.B. would be dropped off.

81.    Ms. Whaley explained D.B.'s medical conditions, his diagnosis, and the serious
       consequences to missing his medications to the nurse. Ms. Whaley further explained D.B.'s
       dependency on Lorazepam and Seroquel to the nurse.

82.    At that time, the nurse reversed course and said not to bring either medication as the
       medications would not be given unless Dr. Blanche ordered it.

83.    Ms. Whaley further explained that D.B. is autistic, could not defend himself physically,

11

and may not know how to ask for his medications. Ms. Whaley told the nurse that D.B had

been in the prison in December of 2018. Ms. Whaley then asked to speak to Ms. Cindy

Pyles, the nursing director.

84.   Ms. Whaley was told that Ms. Pyles was no longer employed at the prison and the nurse

asked who Ms. Whaley's son was. Ms. Whaley gave her D.B.'s name and the nurse said

"Oh, we know Mr. D.B." Ms. Whaley asked the nurse to try to make sure D.B saw a doctor

so he could get his medications soon and be kept safe and the nurse replied "this is a jail

not a hospital I'm not talking to you about this."

85.   On April 15, 2019, Ms. Whaley voluntarily took D.B. to the EBRPP to turn himself in on

the warrant.

86.   Later the same day, April 15, 2019, D.B called Ms. Whaley and said he was being housed

in general population.

87.   As early as the first day of D.B.'s arrival, on April 15, 2019, the medical staff at the EBRPP

noted that D.B. had "DEPRESSION & ANXIETY."

88.   On the next day, April 16, 2019, D.B. called Ms. Whaley again and said he was not getting

his medications.  D.B. cannot miss a single dose of his blood thinner, Brilanta or his blood

pressure medication, Metaprolol due to his recent heart attack.

89.   Ms. Whaley tried to call the warden through the Sheriff's secretary using the telephone

numbers on their website. Ms. Whaley was not able to reach anyone.

90.   On Tuesday, April 16, 2019, Ms. Whaley sent text messages to Suzy Gautreaux, wife of

Sid Gautreaux. Ms. Whaley told Ms. Gautreaux who she was (Ms. Gautreaux was a former

family realtor) and explained to Ms. Gautreaux that D.B. was in jail, had a serious cardiac

condition, was disabled and not getting his medications.  Ms. Gautreaux texted back and said that she would show Ms. Whaley's message to Sid Gautreaux when he got home. Several hours later, Ms. Gautreaux texted Ms. Whaley again and said "Sid will follow up on this, I am praying for your son."

91. On Wednesday morning April 17, 2019, Ms. Whaley was contacted by Warden Grimes stating "I got a call from the sheriff and Mrs. Suzy about your son D.B." Ms. Whaley explained the situation to Warden Grimes and told him D.B. was autistic and could not defend himself physically and had a serious cardiac condition.

92. Warden Grimes replied "this is above my head, I'm going to have the medical director call you. I am going to hang up and she will call you right back."

93. Several minutes later Shelly Rushing called Ms. Whaley and said D.B. was in medical having an EKG run and that Ms. Whaley "had to understand that it takes time for a jail to get medicines to inmates due to the way their system works."

94. Ms. Rushing informed Ms. Whaley that the reason D.B. was not getting his Lorazepam and Seroquel is because other inmates would take the medication, grind it, and ingest the medication.

95. Ms. Rushing stated that D.B. would be given his medications and that he was being moved to protective custody. Ms. Rushing stated that in protective custody D.B. could be observed by a Sheriff's deputy at all times and that he would be monitored and watched.

96. Ms. Whaley asked Ms. Rushing how quickly they would know if D.B. was having chest pain and she said "He is being watched. The other inmates can call for help for him also."

97. Ms. Whaley spoke with Ms. Rushing about the Lorazepam and Seroquel.  Ms. Rushing

said "he is seeing Dr. Blanche for a Psych eval and he will probably put him back on it."

98.   Ms. Whaley informed Ms. Rushing that D.B. wouldn't sleep at all without it and that would increase his panic and work on his heart.  Ms. Rushing said they would give him something else.

99.   When D.B. called Ms. Whaley the next day, D.B. informed Ms. Whaley that the medical staff was giving him Trazadone. This medication is dangerous for someone with history of recent heart attack.

100.   Ms. Whaley called Ms. Rushing back and Ms. Rushing again told Ms. Whaley that Dr. Blanche would see D.B. "soon".

101.   D.B. never received a full evaluation from Dr. Blanche and was never given Lorazepam or Seroquel.   Instead, he was kept on Trazadone until he left jail.

102.   The medical staff at the EBRPP had detailed knowledge of D.B.'s need for an accommodation and protection. In D.B.'s medical records, for April 17, 2019, there is a recommendation "Isolation - single cell (Please place in singled cell - Offender is Autistic with child like behavior. Can easily be preyed upon.)".

103.   On April 17, 2019, D.B.'s medical records contain a progress note that reads "current trial of trazadone until cleared to continue Ativan and Seroquel **patient not sleeping**." (emphasis added). Despite notice that his medications were not working, as is set forth below, D.B. was never evaluated.

104.   On Thursday, April 18, 2019, D.B. called Ms. Whaley and said he had been on lockdown since Wednesday April 17.  During the call, D.B. said he was scared and had not been sleeping.

14

105.   Unbeknownst to Ms. Whaley, D.B. was housed on the "M" line.

106.   The "M" line is a row of cells for individuals who are on disciplinary lockdown or "medical lockdown." At one end of the row is a door entering the hallway. At the other end of the hallway is a decrepit shower facility. In between the two ends is a long hallway.

107.   An inmate traveling from their cell to the shower facility must pass by the cells of the other inmates. The inmate traveling in the hallway can easily get directly in front of the cells of the other inmates.

108.   Upon information and belief, unlike what Ms. Rushing represented to Ms. Whaley, the "M" line is not constantly supervised. Instead, upon information and belief, one guard walks the hallway every fifteen minutes. While the guard is not walking the hallway, another inmate is let out of their cell. During the time the inmate is out of their cell, they can walk up and down the line, they can go take a shower, and on some days they can make a phone call. Additionally, given the lack of supervision, an unsupervised inmate unattended on the "line" has the physical ability to spend their time talking with other inmates, harassing other inmates, or demanding sexual favors.

109.   Upon information and belief, due to his disability and unmedicated state, D.B. was quickly determined by other inmates to be an easy target for manipulation and sexual abuse.

110.   Unknown to Ms. Whaley, two inmates began to harass and threaten D.B. upon his arrival on April 17, 2019.

111.   These inmates threatened to throw feces and vomit into D.B.'s face.

112.   D.B. asked the inmates to stop harassing him, but they continued to threaten him.

113.   On April 18, 2018 one inmate demanded that D.B. perform sexual favors. The inmate

demanded that D.B. perform manual stimulation of his genitals and that D.B. perform oral stimulation of his genitals.

114.    The inmate threatened to throw feces and vomit in D.B.'s face if D.B. did not comply.

115.    Upon information and belief, the inmate also suggested or explicitly threatened D.B. with violent physical abuse if he did not comply.

116.    D.B.—easily subject to manipulation and abuse due to his disability—was concerned that he would have feces and vomit thrown in his face if he did not comply. Based on this concern and fear, D.B. acquiesced and performed manual and oral stimulation of the abuser's genitals. While performing this stimulation, the inmate reached through the bars of the cell and fondled D.B.'s genitals.

117.    Eventually, the abusive inmate informed D.B. that he could go back to his cell.

118.    On another occasion, the inmate came to D.B.'s cell and demanded that D.B. remove his clothes or be subjected to having feces and vomit flung in his face.

119.    Based on concern and fear, D.B. acquiesced and removed his jump suit. The other inmates then made D.B. spread his legs and expose his body. Upon information and belief, this was done in an effort to humiliate, control, and abuse D.B.

120.    D.B. called Ms. Whaley again Saturday, April 20 and during that call D.B. informed Ms. Whaley that he still had not seen Dr. Blanche and that he hadn't slept "in about a week."

121.    On Tuesday, April 23 D.B. called Ms. Whaley and informed that "Things are happening to me I need help."  Ms. Whaley asked "What is happening" and D.B replied "I can't tell you or it will get worse."

122.    Ms. Whaley tried to reach out to medical again and the nurse that answered said Shelly

Rushing wasn't there and to call back.

123.   Ms. Whaley called later and tried to explain to Shelly Rushing that D.B. was anxious and scared, and Ms. Rushing responded "He's adapting.  He's not at home where he can watch television and walk around.  He'll be fine."

124.   Ms. Whaley asked the nurse if she had seen D.B. and she said not today but that D.B. was monitored at all times and that "someone" was observing D.B. "at all times."

125.   Ms. Whaley asked again if D.B. could see Dr. Blanche and get his medications. Ms. Rushing said "hold on," left Ms. Whaley on hold 45 minutes, and never came back to the phone.

126.   On Wednesday, April 24, Ms. Whaley went to see D.B for visitation.  D.B. said "I can't tell you over this phone what's happening or it will get worse but I need help."

127.   Ms. Whaley told D.B. to hang up the phone, come close to the viewing window and mouth to her what was happening.

128.   D.B. pointed to his mouth and said an inmate was putting (pointing to his genitals) this in my (pointing to his mouth).

129.   D.B.  then mouthed that "I have to take my clothes off."

130.   Ms. Whaley ran down the hall and asked Sergeant Leonard Gaines, who was working visitation, for assistance because D.B. was being sexually abused.

131.   Sergeant Gaines told Ms. Whaley that "You have to talk to Capt. White."

132.   Ms. Whaley waited for over an hour for Captain White. Meanwhile a woman calling herself Iris Scott came out of her office and said "Come in my office and tell me what happened and dry your face." Ms. Whaley related the story to her and she said "This happens all the

time and they are not going to do anything about it, you're not the first crying mama to sit in my office this week."

133.    Ms. Whaley left Ms. Scott's office, went to her car, and texted Suzy Gautreaux. In her message(s), Ms. Whaley informed Ms. Gautreaux that that she was at the jail and that D.B. was being sexually abused. Ms. Whaley asked Ms. Gautreaux to call her husband so Ms. Whaley could talk to him.

134.    Ms. Whaley then called the number given to her for Captain White and he answered and told Ms. Whaley that D.B. had been moved from lockdown and was in a walled cell and that a full investigation would follow.

135.    Captain White said "It's unfortunate that this stuff happens, but it does and I know how you feel because some of my own kids are in jail right now."  It is unknown if Captain White's incarcerated children also have Asperger's Syndrome.

136.    Captain White went on, stating "When he came in we knew he was autistic and didn't know where to put him but now we are moving him to a cell behind a wall where the deputies do their paperwork and he will be monitored by a deputy 24/7."

137.    On April 24, 2019, Ms. Whaley also spoke with Captain Johnny Scott. During that conversation, Ms. Whaley informed Captain Scott about D.B.'s abuse.

138.    Captain Scott documented this conversation in a signed, written statement.

139.    Additionally, in a memorandum dated May 7, 2019, Captain Johnny Scott documented an investigation that was conducted by himself, Sergeant Gaines, and other officers. In the memorandum, Captain Scott documented a statement by D.B. to Captain Scott in which D.B. stated that he was coerced to perform oral sex on a specific inmate and that the inmate

"threatened to throw feces on him if he refused."

140.    Once he was in the walled-cell, D.B. was not subject to further sexual abuse.

141.    Ms. Whaley bonded D.B. out Monday, April 29, 2019.

142.    Based on a pre-suit investigation, a video exists which proves that April 18, 2019, D.B. was not being "constantly monitored" as Ms. Rushing claimed. Instead, D.B. was unsupervised in the open hallway of "M" line.

143.    The video evidence proves that D.B. performed manual and oral sexual contact with another inmate.

144.    D.B.'s mental health needs were never assessed. For example, Dr. Blanche never did a psychological evaluation on D.B.

145.    On April 26, 2019, Dr. Blanche told Ms. Whaley that he spoke to D.B. for "all of two minutes on the unit while seeing another inmate" and that did not perform an evaluation D.B.

146.    In D.B.'s medical records a "problem" was "opened" on 4-17-2019 2:26 pm, which is listed as "PSYCHOLOGICAL / MENTAL HEALTH." In his medical records provided by CorrectHealth on June 18, 2019, that "problem" is listed as having a Current Status of "open" and the Date Closed of "*[blank]*." Upon information and belief, this indicated that D.B. was supposed to be evaluated for his mental health, but that no such evaluation ever occurred.

**Defendants Failed to Reasonably Accommodate D.B.**

147.    By and through the conversation between Ms. Whaley and Ms. Rushing prior to bringing D.B. in for processing, the City/Parish had notice of D.B.'s disabilities, his limitations and his need for an accommodation.

19

148. Nonetheless, despite knowledge of his need for a modification/accommodation, the City/Parish failed to reasonably accommodate D.B.

149. The City/Parish and the Sheriff failed to reasonably accommodate D.B. by failing to engage in an interactive dialogue with D.B. and Ms. Whaley about D.B.'s needs.

150. The City/Parish and the Sheriff failed to reasonably accommodate D.B. by failing to screen him for a disability upon his initial acceptance into the EBRPP.

151. The City/Parish and the Sheriff failed to reasonably accommodate D.B. by not adequately investigating the nature, extent, and limitations of D.B.'s disability upon his initial acceptance into the EBRPP.

152. The City/Parish failed to reasonably accommodate D.B. by not to putting D.B. into protective custody upon Ms. Rushing learning that D.B. has Asperger's Syndrome.

153. The City/Parish and the Sheriff failed to reasonably accommodate D.B. by not modifying their policies, procedures, and practices as necessary to ensure the safety and equality of access for inmates with mental disabilities.

154. The City/Parish and the Sheriff failed to reasonably accommodate D.B. by failing to supervise D.B.

155. The City/Parish and the Sheriff failed to reasonably accommodate D.B. by operating a physical facility with inadequate site lines for the Sheriff deputies that maintain security.

156. The City/Parish and the Sheriff failed to reasonably accommodate D.B. by permitting him to be placed in proximity to inmates who were on lockdown for disciplinary issues while D.B. was on lockdown for medical issues.

157. The City/Parish and the Sheriff failed to reasonably accommodate D.B. by failing to

provide him with an equal opportunity to use the telephone, shower, and to possess personal items as inmates in the general population.

158.  The City/Parish failed to reasonably accommodate D.B. by failing to provide him with the medications and psychiatric services he needed to safely manage his anxiety, depression, and overall sanity.

159.  The City/Parish and the Sheriff had knowledge of D.B.'s disability, limitations, and need for an accommodation, but chose not to accommodate his needs. This constitutes "intentional discrimination."

160.  By and through the actions set forth above, the City/Parish and the Sheriff committed "intentional discrimination."

161.  The City/Parish and the Sheriff made decisions based on considerations of their own convenience and not based on the needs of D.B.

**Defendants Treated D.B. Differently on Account of His Disability**

162.  In addition to failing to reasonably accommodate D.B., the City/Parish and the Sheriff also discriminated against D.B. by treating him differently on account of his disability.

163.  According to Warden Grimes in a deposition in a similar case, medical lockdown is for "anybody with medical issues, disciplinary issues, behavior issues. It's just temporary housing."

164.  The Sheriff's office determines whether a person in medical lockdown is allowed to be out of their cell.

165.  The cells in medical lockdown do not differ in any way from those used to house inmates in lockdown for disciplinary issues.

166.  Inmates in medical lockdown are not released on "the yard" with general population, but

rather are only allowed to go on "the tier."

167. The "tier" is indoors, meaning prisoners in lockdown are not permitted to go outside.

168. Inmates on lockdown are not taken to eat with the other inmates, but rather food is brought to them.

169. While an inmate in the general population can make a telephone call during regular hours, inmates on lockdown are limited to a minimum of one (1) telephone call per week. In practice, inmates on lockdown are limited to calls on Tuesday, Thursday, and Saturday for several minutes.

170. While an inmate in the general population can take a shower during regular hours, inmates on lockdown are limited to one ten to fifteen-minute window per day. Additionally, this narrow window coincides with the window to make personal calls.

171. Because all grievances are stationed at the "chow" hall, inmates are unable to submit grievances in the normal location.

172. Individuals on lockdown—including individuals on medical lockdown—are restricted to a specific list items, such as one shampoo or one Bible or religious book.

173. Inmates with disabilities who are placed on "medical lockdown" are subject to the same terms of confinement as disciplinary lockdown.

174. In contrast, individuals who are in the general population are permitted to have more extensive possession of personal items than individuals on medical lockdown.

175. For example, an inmate on medical lockdown is not allowed to have a Walkman. In contrast, an inmate in general population is allowed to possess a Walkman.

176. Likewise, inmates in the general population can have magazines, while inmates on

lockdown cannot have magazines.

177.    Inmates in the general population can have more than one book; inmates on lockdown are limited to one book.

178.    Inmates on lockdown have restricted phone privileges and this applies to individuals on medical lockdown as well.

179.    Unlike inmates in general population, inmates who are on medical lockdown are not allowed to watch any television, and no consideration is given to the fact that they aren't there for disciplinary purposes.

180.    Upon information and belief, because he was on the "M" line, D.B. was on what is known as medical lockdown.

181.    Therefore, D.B. was treated differently from non-disabled inmates solely on account of his disability.

## Law and Itemization of the Damages

182.    42 U.S.C. § 12133 provides: "[t]he remedies, procedures, and rights set forth in section 794 of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."

183.    28 C.F.R. § 35.150(a) specifically provided that "A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."

184.    When viewed in its entirety, the East Baton Rouge Parish Prison was not readily accessible to or usable by D.B.

185.  28 C.F.R. § 35.130 provides that "(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

    (i)    Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

    (ii)   Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

    (iii)  Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;"

186.  By and through their actions described above, the City/Parish and the Sheriff violated 28 C.F.R. § 35.130(1)(i)-(iii).

187.  Pursuant to 28 C.F.R. § 35.130 (7) "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability...."

188.  By and through the actions set forth above, Ms. Whaley made numerous requests for reasonable modification on behalf of D.B., but these requests were denied by the City/Parish. Accordingly, the City/Parish and the Sheriff are liable to D.B. for violation of 28 C.F.R. § 35.130 (7).

189.  Upon information and belief, as a result of the discrimination set forth above, D.B. has suffered the following damages:

    •    Sexual abuse;

- Harassment;

- Invasion of privacy through the unwanted touching of D.B.'s body by other inmates;

- Sleep deprivation;

- Emotional and mental distress, anxiety, and humiliation;

- Invasion of his civil rights.

190. D.B. demands a recovery of damages in this matter.

191. D.B. has retained the undersigned counsel and is entitled to recover reasonable attorneys' fees, costs and litigation expenses from the City/Parish and the Sheriff pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 35.175.

**D.B. Suffers From a Real and Immediate Risk of Injury Absent an Order of Injunctive Relief.**

192. While D.B. and Ms. Whaley do not hope, desire, or intend for D.B. to return to the East Baton Rouge Parish Prison, there is a significant and realistic likelihood that D.B. will return to the East Baton Rouge Parish Prison in the future.

193. The nature of D.B.'s disability is permanent.

194. D.B. has been arrested twice within the last year for improper use a of a telecommunication device.

195. Upon information and belief, D.B. has obsessive and compulsive thoughts about using a telecommunication device to send messages to an individual who he believes has wronged him.

196. Up information and belief, D.B. continues to have these obsessive and compulsive thoughts.

25

197. While Ms. Whaley is diligently working to ensure that D.B. does not receive access to a telecommunication device, given the prevalence of smartphones in modern society, there is the distinct and realistic possibility that D.B. will acquire a new smartphone.

198. Upon obtaining a new telephone, there is the distinct and realistic likelihood that D.B. will use the device to send inappropriate messages and/or voicemails. Accordingly, there is the distinct and realistic likelihood that D.B. will again be arrested and taken to the EBRPP.

199. Therefore, while D.B. and Ms. Whaley cannot affix a "date-certain" on when D.B. will return to the EBRPP, the condition and accessibility of the prison impacts D.B.'s life.

200. If the EBRPP was a safe environment that served the purpose of retribution and rehabilitation, then Ms. Whaley would not be as concerned about D.B. being sent to the EBRPP.

201. However, due to the horrific nature of D.B.'s treatment at the EBRPP and City/Parish's failure to adopt policies, procedures, and practices, Ms. Whaley is concerned that any subsequent trips by D.B. back to the EBRPP could result in harassment, sexual abuse, or death due to improper medications.

202. Absent an Order of injunctive and declaratory relief, the City/Parish and the Sheriff's office will not modify their discriminatory policies, procedures, and practices.

203. A showing of "intentional discrimination" is not required for D.B. to recover injunctive and declaratory relief.

**COUNT II**
**VIOLATION OF THE REHABILITATION ACT**
**AS TO THE CITY/PARISH AND THE SHERIFF**

204. D.B. adopts and re-alleges the factual allegations contained in paragraphs 1-203 as if fully

stated herein.

205.    D.B. brings this claim against the City/Parish and the Sheriff, based upon the Rehabilitation Act, 29 U.S.C. §794, *et seq*.

206.    The Rehabilitation Act provides that:

No otherwise qualified individual with handicaps in the United States, as defined by 7(8) [29 USCS § 706(8)], shall, solely by reason of his or her handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.  29 U.S.C. § 794(a).

207.    As set forth herein, the City/Parish and the Sheriff violated the Rehabilitation Act by intentionally excluding D.B., solely by reason of his disabilities, from the participation in, and denying him the benefits of, and have otherwise subjected him to discrimination under, the City/Parish and the Sheriff's programs and activities.

208.    A non-exclusive list of the City/Parish and the Sheriff's violations of the Rehabilitation Act and  discriminatory conduct against D.B. are evidenced by:

A.    denying D.B. access to, and the opportunity to participate in or benefit from, the aids, benefits, activities, programs, accommodations and services offered at the East Baton Rouge Parish Prison;

B.    by otherwise limiting D.B. in the enjoyment of the rights, privileges, advantages and opportunities enjoyed by individuals without disabilities

who receive the City/Parish and the Sheriff's aids, benefits and services;

C.      making facility site or location selections that have the effect of discriminating against individuals with disabilities and excluding them from and denying them the benefits of, and defeating or substantially impairing the accomplishment of the objectives of, the services, programs and activities offered by the City/Parish and the Sheriff at the East Baton Rouge Parish Prison;

D.      failing to administer services, programs and activities in the most integrated setting appropriate to the needs of D.B.;

E.      excluding D.B. from participation in, and the benefits of, the City/Parish and the Sheriff's services programs and activities as a result of the EBRPP being poorly designed with lack of adequate sight lines;

F.      denying requests for reasonable accommodation/modification made on behalf of D.B.

209.   Upon reasonable belief, the City/Parish and the Sheriff are the recipient of federal funds.

210.   As the recipient of federal funds, the City/Parish and the Sheriff are liable for damages to D.B. as a result of their acts and omissions constituting intentional discrimination.

211.   As set forth above, D.B. has been denied access to the services, programs, facilities, activities and accommodations offered by the City/Parish and the Sheriff solely by reason of his disability, and has otherwise been discriminated against and damaged solely by reason of his disability as a result of the City/Parish and the Sheriff's Rehabilitation Act violations set forth above.

28

212.    D.B. has been obligated to retain undersigned counsel for the filing and prosecution of this action. D.B. is entitled to recover those attorneys' fees, costs and litigation expenses from the City/Parish and the Sheriff pursuant to 29 U.S.C. §794(b).

## COUNT III: VIOLATIONS OF THE LOUISIANA COMMISSION ON HUMAN RIGHTS AS TO CORRECTHEALTH

213.    D.B. repeats and realleges all preceding paragraphs in support of this claim.

214.    At all times relevant to this action, the Louisiana Commission on Human Rights, LA. REV. STAT. ANN. § 51:2231 et. seq., (hereafter "LCHR") has been in full force and effect and has applied the conduct of CorrectHealth.

215.    At all times relevant to this action D.B. has experienced substantial limitations to several major life activities, including thinking, communicating, and social interactions and has been an individual with a disability within the meaning of the Louisiana Commission on Human Rights, LA. REV. STAT. ANN. § 51:2232(3)(a).

216.    At all times relevant to this action, CorrectHealth has qualified as places of public accommodation, resort, or amusement as defined by LA. REV. STAT. ANN. § 51:2232(9) by virtue of having been supported directly or indirectly by government funds.

217.    The LCHR prohibits discriminatory practices and provides that "it is a discriminatory practice for a person to deny an individual the full and equal enjoyment of goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation, resort, or amusement . . . on the grounds of . . . disability." LA. REV. STAT. ANN. § 51:2247.

218.    The LCHR extends relief to "any person deeming himself injured by" discrimination in violation thereof. LA. REV. STAT. ANN. § 51:2264.

29

219.    CorrectHealth discriminated against D.B., on the basis of disability, in violation of LA. REV. STAT. ANN. § 51:2247, by denying him the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations offered at EBRPP, as is set forth in the above paragraphs.

220.    D.B. deems himself injured by the CorrectHealth's discrimination and brings suit under the LCHR to recover compensatory damages for the injuries and loss he sustained as a result of CorrectHealth's discriminatory conduct, intentional discrimination, and deliberate indifference as alleged herein above.

221.    D.B. is further entitled to injunctive relief, as well as an award of attorneys' fees, costs, and disbursements pursuant to the LCHR. LA. REV. STAT. ANN. § 51:2264.

## Demand for Trial by Jury

222.    D.B. demands a trial by Jury as to the issues of (1) the damages suffered; and (2) the quantum of the damages suffered.

## PRAYER FOR RELIEF

WHEREFORE, D.B. prays that:

   A.    This Court awards monetary damages (compensatory and nominal), pursuant to Title II and 29 U.S.C. § 794a(a)2 for the harm caused by the discriminatory practices and actions by the City/Parish and the Sheriff;

   B.    This Court award actual damages pursuant to LA. REV. STAT. ANN. § 51:2264 for the harm caused by the discriminatory practices and actions by CorrectHealth.

   C.    This Court award injunctive and declaratory relief to ensure that D.B. is not

subjected to illegal discrimination in the future;

D.    This Court award of reasonable attorneys' fees, costs and litigation expenses pursuant to 29 U.S.C. § 794a(a)2, 42 U.S.C. § 12205, and LA. REV. STAT. ANN. § 51:2264; and,

E.    Such other relief as the Court deems just and proper, and/or is allowable under Title II of the ADA, the Rehabilitation Act, and the LCHR.

Respectfully Submitted,

**BIZER & DEREUS, LLC**
Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Emily A. Westermeier (LA # 36294)
ewest@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

By:/s/ Garret S. DeReus
       GARRET S. DEREUS