## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

D.B., AN INDIVIDUAL, BY AND
THROUGH HIS NEXT FRIEND
DARLENE WHALEY

CIVIL ACTION

VERSUS

NO.  19-620-JWD-EWD

CORRECTHEALTH EAST BATON ROUGE, LLC
SHERIFF SID J. GAUTREAUX, III, AND THE
CITY/PARISH OF EAST BATON ROUGE

### RULING AND ORDER

This matter is before the Court on the *Motion to Dismiss* ("*Sheriff's Motion*") filed by

Sheriff Sid Gautreaux, III ("Sheriff") (Doc. 15) and the *Motion to Dismiss for Failure to State a*

*Claim; Alternatively, Motion to Strike Allegations within the Complaint, Rec. Doc. 1*,

("*City/Parish's Motion*") filed by the City of Baton Rouge/Parish of East Baton Rouge

("City/Parish"). (Doc. 26.) Plaintiff responded in opposition to both motions. (Doc. 23 and 36.)

The Sheriff filed a reply. (Doc. 33.) Oral argument is not necessary. The Court has considered

the facts alleged in the *Complaint*, the arguments of the parties, the law, and for the reasons

expressed below will deny the motions.

### FACTUAL BACKGROUND

For the purpose of ruling on the motions, the Court accepts the well pleaded facts of the

*Complaint* as true. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502-03 (5th Cir. 2014).

Plaintiff, D.B., an individual who has severe Asperger's Syndrome, through his next of

friend Darlene Whaley, filed suit against the Sheriff, the City/Parish, and CorrectHealth East

Baton Rouge LLC ("CorrectHealth") under Title II of the Americans with Disabilities Act

("ADA") and the Rehabilitation Act of 1973 ("RA") for injunctive and declaratory relief and

damages. (Doc. 1 at 1.)

1

D.B. is a qualified individual with a disability under the ADA and RA because of his diagnosis of Asperger's Syndrome, a congenital autism disorder, which is characterized by significant difficulties in social interaction. (*Id.* at ¶ 5.) In 2005, D.B. was interdicted under Louisiana law and the court granted curatorship to Ms. Darlene J. Whaley. (*Id.* at ¶ 13.) D.B. has difficulty with reading social cues and understanding meaning in social interactions; he has limited cognitive brain function. (*Id.* at ¶ 6.) D.B.'s disability and consequent limitations causes him to: (1) be unable to engage in rational thinking, decision making, and successful social interactions; (2) be unable to hold jobs due to his poor social interaction, inability to concentrate and learning disabilities; (3) engage in repetitive behaviors; (4) engage in socially inappropriate behavior such as making repeated phone calls to an individual with which he becomes obsessed; (5) be subject to manipulation and persuasion. (*Id.* at ¶¶ 8-11, 14.) D.B. suffers from a long pattern of abnormal behavior with exaggerated feelings of self-importance, including not identifying as a person with a disability. (*Id.* at ¶ 12.)

The City/Parish owns the East Baton Rouge Parish Prison ("EBRPP") and is responsible for providing the physical facility, all medical services and for funding the prison. (*Id.* at ¶ 25-26.) The EBRPP has been dysfunctional for years, especially pertaining to the medical care of inmates. (Doc. 1 at ¶¶ 27-34.) In order to meet the medical needs of the inmates, Health Management Associates, were tasked by the Baton Rouge Metro Council to determine what changes would need to be made. Based on the report of Health Management Associates, the Baton Rouge Metro Council chose to use the private company CorrectHealth to deliver medical care at the EBRPP. (*Id.* at ¶¶34-59.) The City/Parish makes no attempt to accommodate persons with disabilities at the EBRPP. (*Id.* at ¶¶ 67-72.)

On December 5, 2018, D.B. was taken to the EBRPP where his Prison Transport Record was marked by the Sheriff's office to indicate that he was autistic. (Doc. 1 at ¶¶ 73-75.) In addition, medical staff completed a Medical Clearance Form indicating that he was not cleared for general population/booking. (*Id.* at ¶ 76.)

On April 11, 2019, a warrant was issued for D.B. for improper telephone communication. (*Id.* at ¶ 78.) Before D.B. voluntarily reported to the authorities, Ms. Whaley tried to make arrangements for D.B. with the medical division of the EBRPP to bring D.B.'s psychiatric and other medications. (*Id.* at ¶ 79.) D.B. takes Lorazapam and Seroquel to help with his severe anxiety and panic attacks related to his Asperger's Syndrome. (*Id.* at ¶ 15.) Withdrawal from these psychiatric medications can include seizures, heightened anxiety, panic, depression, inability to sleep, and cardiac strain. (*Id.*)

Ms. Whaley explained D.B's medical conditions, diagnoses, and the dangers of withdrawal. (*Id.* at ¶ 81.) She also explained that D.B. cannot defend himself physically and would not ask for his medication. (*Id.* at ¶ 83.) Ms. Whaley was first told to bring D.B.'s medications, in separate vials, to the "guard shack" where D.B. would be dropped off. (*Id.* at ¶ 80.) Then she was told to not bring either the Lorazepam or Seroquel because it would not be dispensed without orders from Dr. Blanche. (*Id.* at ¶ 82.) Ms. Whaley asked the nurse she was speaking with to ensure that D.B. saw Dr. Blanche so that he could get his meds and also asked that he be kept physically safe. (*Id.* at ¶ 84.) The nurse replied, "[T]his is a jail not a hospital I'm not talking to you about this." (*Id.* at ¶ 85.)

D.B. voluntarily reported to authorities and was placed in general population. (*Id.* at ¶¶ 85-86.) Upon intake, the medical staff at the EBRPP noted D.B. had depression and anxiety. (*Id.* at 87.) On April 15 and April 16, 2019, D.B. was not given his blood thinner, Brilanta, or his

blood pressure medication, Metoprolol. (*Id.* at ¶ 88.) Ms. Whaley attempted to call the Warden and was not able to reach anyone. (*Id.* at ¶ 89.) Without other options, Ms. Whaley texted Suzy Gautreaux, the Sheriff's wife, who was Ms. Whaley's former family realtor. Ms. Whaley explained to Ms. Gautreaux that D.B. was disabled, had a serious cardiac condition, and was not getting his medications. Ms. Gautreaux replied that once the Sheriff returned home, "Sid will follow up on this, I am praying for your son." (*Id.* at ¶ 90.)

Warden Grimes followed up with Ms. Whaley on April 17, 2019, stating, ""I got a call from the sheriff and Mrs. Suzy about your son D.B." (Doc. 1 at ¶ 91.) When Ms. Whaley explained the situation, Warden Grimes' response was, "[T]his is above my head, I'm going to have the medical director call you. I am going to hang up and she will call you right back." (*Id.*)

Ms. Shelly Rushing called Ms. Whaley back and informed her: (1) D.B. was getting an EKG and that Ms. Whaley "had to understand that it takes time for a jail to get medicines to inmates due to the way their system works;" (2) D.B. could not have Lorazepam and Seroquel because other inmates would take the medicines, grind them up and ingest them; (3) D.B. would be moved to protective custody where he would be observed at all times by a deputy and could get his medication once he had a psychiatric evaluation; and (4) in protective custody D.B. would "be[] watched [and] the other inmates can call for help for him also" in the event of a cardiac incident. (*Id.* at ¶ 93-97.) Ms. Rushing informed Ms. Whaley that until D.B. could get his Lorazepam or Seroquel, the parish prison would give him Trazadone, which was dangerous given D.B.'s history of a recent heart attack. (*Id.* at ¶¶ 98-99.) D.B. never received a full evaluation from Dr. Blanche, did not receive Lorazepam or Seroquel, and was kept on Trazadone until he left the EBRPP. (*Id.* at ¶ 100-101.)

Based on the phone calls with Ms. Whaley and their observations of D.B., the medical staff noted in his medical records for April 17, 2019 that they recommended: "Isolation – single cell (Please place in singled [sic] cell – Offender is Autistic with child like behavior. Can easily be preyed upon)." (Doc. 1 at ¶ 102.) D.B.'s medical records also note that "current trial of trazadone until cleared to continue Ativan and Seroquel [;] **patient not sleeping.**" (*Id.* and ¶ 103.)

After being moved out of the general population, D.B. was placed onto the "M Line". (*Id.* at ¶ 105.) At EBRPP, according to Warden Grimes, medical lockdown on the "M Line" is for "anybody with medical issues, disciplinary issues, behavior issues." (*Id.* at ¶ 60.) The decision to place someone on the M Line is made by the Sheriff and the cells do not differ between those housing inmates in medical care and those on the M Line for disciplinary issues. (*Id.* at ¶ 61.) Inmates on the M Line are not released on the yard or allowed to go outside and do not receive an equal opportunity to use the telephones, take showers, or possess personal items. (*Id.* at ¶¶ 62-63.) Inmates on the M Line are not able to submit grievances in the normal location. (*Id.* at ¶ 171.) To get to the showers, an inmate must pass directly by the cells of the other inmates. (*Id.* at ¶ 107.) The M Line is not supervised constantly and instead, one guard walks the hallway every fifteen minutes. (*Id.* at ¶ 108.) While the guard is not walking the hallway, an inmate is let out of his cell. During the time the inmate is out of his cell, he can walk up and down the line, he can go take a shower, and on some days, he can make a phone call. (*Id.*)

Due to D.B.'s disability, and his unmedicated state, D.B. was identified by other predatory inmates as an easy target for manipulation and sexual abuse. (*Id.* at ¶ 109.) Starting on April 17, 2019, two inmates began to threaten that they would throw feces and vomit into D.B.'s face. (*Id.* at ¶ 111.) D.B. asked the inmates to stop, but they did not. (*Id.* at ¶ 112.) While

continuing to threaten to throw vomit and feces at D.B. and by threatening other physical violence, on April 18, 2019, one inmate sexually assaulted D.B. by demanding that he perform manual stimulation and oral stimulation of his genitals. (*Id.* at ¶¶ 113-115.) D.B., easily subject to manipulation and abuse, complied with the inmate and performed manual and oral stimulation of the abuser's genitals. (*Id.* at ¶ 116.) The inmate also reached through the cell bars and fondled D.B.'s genitals. (*Id.*) The sexual abuse continued on another occasion where D.B. was forced to remove his clothes, spread his legs and expose himself. (*Id.* at ¶ 118-119.)

D.B. called Ms. Whaley on Saturday, April 20, 2019 and informed her that he had not slept in a week and had not seen Dr. Blanche. (*Id.* at ¶ 120.) D.B. next called on Tuesday, April 23, 2019, and told Ms. Whaley, "Things are happening to me, I need help." (*Id.* at ¶ 121.) When Ms. Whaley asked what was happening, D.B. responded, "I can't tell you or it will get worse." (*Id.*) Ms. Whaley reached out to the medical staff to see what was going on, and informed them that D.B. was anxious and scared. (*Id.* at ¶ 122.) Ms. Rushing responded, "He's adapting. He's not at home where he can watch television and walk around. He'll be fine." (*Id.* at ¶ 123.) Ms. Rushing assured Ms. Whaley that someone was observing D.B. at all times. (Doc. 1 at ¶ 124.) When Ms. Whaley asked if D.B. could see Dr. Blanche and get back on his medications, Ms. Rushing responded hold on, put Ms. Whaley on hold for 45 minutes and never came back on to the phone. (*Id.* at ¶ 125.) In D.B.'s medical records, a "problem" was "opened" on 4-17-2019 2:26 pm, which is listed as "PSYCHOLOGICAL / MENTAL HEALTH." In his medical records provided by CorrectHealth on June 18, 2019, that "problem" is listed as having a Current Status of "open" and the Date Closed of "*[blank]*." (*Id.* at ¶ 146.) Dr. Blanche spoke to D.B. for "all of two minutes on the unit while seeing another inmate." (*Id.* at ¶ 145.)

On Wednesday, April 24, 2019, Ms. Whaley went to see D.B. for visitation. D.B. refused to tell Ms. Whaley over the phone what was happening, so he signaled through the viewing windows that another inmate was sexually assaulting him and forcing him to take off his clothes. (*Id.* at ¶¶ 126-129.) Ms. Whaley tried to seek assistance from Sergeant Leonard Gaines who was working visitation, but Sergeant Gaines told her that she would need to speak with Captain White. (*Id.* at ¶ 130-131.) Ms. Whaley waited for over an hour to speak with Captain White. (*Id.* at ¶ 132.) While waiting, a Ms. Iris Scott came out of her office and had Ms. Whaley come in and tell her the story. (*Id.*) Ms. Scott told Ms. Whaley, "This happens all the time and they are not going to do anything about it[;] you're not the first crying mama to sit in my office this week." (*Id.*)

When Ms. Whaley left Ms. Scott's office, she texted Ms. Gautreaux, informed Ms. Gautreaux of the sexual abuse and asked if she could speak to the Sheriff. (*Id.* at ¶ 133.) Ms. Whaley called the number given to her for Captain White, who informed her that D.B. had been moved from lockdown into a walled cell and that a full investigation had been started. (*Id.* at ¶ 134.) Captain White stated, "It's unfortunate that this stuff happens, but it does and I know how you feel because some of my own kids are in jail right now. . . When he came in we knew he was autistic and didn't know where to put him but now we are moving him to a cell behind a wall where the deputies do their paperwork and he will be monitored by a deputy 24/7." (Doc. 1 at ¶¶ 135-136.)

Ms. Whaley also spoke with Captain Johnny Scott about D.B.'s sexual abuse on April 24, 2019 and their conversation was documented by Captain Scott. (*Id.* at ¶¶ 137-138.) Captain Scott conducted the investigation into the sexual abuse. (*Id.* at ¶ 139.) Captain Scott documented D.B.'s statement that he was coerced to perform oral sex on a specific inmate, and that the

inmate threatened to throw feces on him if he refused." (*Id.*) Video evidence from the M Line

shows that D.B. was unsupervised in the open hallway of the M Line. (*Id.* at ¶ 142.) The video

evidence also shows the manual and oral sexual contact with another inmate. (*Id.* at ¶ 143.) D.B.

was not subject to further abuse once he was in the walled cell and Ms. Whaley bonded out D.B.

on Monday April 29, 2019. (*Id.* at ¶ 140-141.)

While D.B. and Ms. Whaley hope that D.B. will not have to return to the EBRPP, there is

a significant and realistic likelihood that D.B. will return to the EBRPP in the future because: (1)

D.B.'s disability is permanent; (2) he has been arrested twice for improper use of a

telecommunication device; (3) D.B. continues to have obsessive and compulsive thoughts about

sending text messages to an individual who D.B. believes wronged him; and (4) the prevalence

of smartphones in society means that despite Ms. Whaley's best efforts, there is a strong

possibility that D.B. will acquire a smartphone and use it to send inappropriate messages and/or

voicemails. (*Id.* at ¶¶ 193-198.) Although there is not a "date certain" on which D.B. will return

to the EBRPP, the contention and accessibility of the parish prison impacts D.B.'s life and Ms.

Whaley is concerned that any subsequent trips back to the EBRPP could result in harassment,

sexual assault and abuse, or death due to improper medication management. (*Id.* at ¶¶ 199-201.)

<u>APPLICABLE STANDARDS</u>

a. *Rule 12(b)(1)*

Concerning the standard for Rule 12(b)(1) motions, the Fifth Circuit explained:

Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a
party to challenge the subject matter jurisdiction of the district court to hear a case.
Fed. R. Civ. P. 12(b)(1). Lack of subject matter jurisdiction may be found in any
one of three instances: (1) the complaint alone; (2) the complaint supplemented by
undisputed facts evidenced in the record; or (3) the complaint supplemented by
undisputed facts plus the court's resolution of disputed facts. *Barrera–Montenegro
v. United States*, 74 F.3d 657, 659 (5th Cir. 1996).

> The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. *McDaniel v. United States*, 899 F.Supp. 305, 307 (E.D. Tex. 1995). Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist. *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).
>
> When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam).... In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief. *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998).

*Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

b. *Rule 12 (b)(6)*

In *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346 (2014), the Supreme Court explained, "Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." 135 S. Ct. at 346-47 (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained: The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand, supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 555 [550] U.S. at 556, 127 S. Ct. at 1965.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.,* No. 10-00177, 2011 WL 938785, at *3

(W.D. La. Feb. 9, 2011) (citation omitted).

More recently, in *Thompson v. City of Waco, Tex.*, 764 F.3d 500 (5th Cir. 2014), the Fifth

Circuit summarized the standard for a Rule 12(b)(6) motion for dismissal:

We accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff . . . To survive dismissal, a plaintiff must plead enough facts to state a claim for relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Our task, then, is to determine whether the plaintiff state a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.

*Id*. at 502–03 (citations and internal quotations omitted).

    *c.  Rule 12(f)*

Rule 12(f) grants the court discretion to "strike from a pleading an insufficient defense or

any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A motion to

strike is "generally disfavored due to the fact that [it is] a drastic remedy and [is] often used as a

dilatory tactic." *Cain v. Exxon Mobil Corporation*, 400 F. Supp. 3d 514, 520 (M.D. La. 2019).

Moreover, a Rule 12(f) motion "should only be granted when the pleading to be stricken has no

possible relation to the controversy." *Id.* "For matters challenged as 'redundant, immaterial, impertinent, or scandalous matter,' a district court should not strike challenged allegations or pleadings simply because they 'offend the sensibilities' of the objecting party." *Gilchrist v. Schlumberger Technology Company*, 321 F.R.D. 300, 301 (W.D. Tex. 2017) (citing *United States v. Coney*, 689 F.3d 365, 379 (5th Cir. 2012)). "Where a challenged matter is 'directly relevant to the controversy at issue' and is at least 'minimally supported' by the allegations set forth in the pleadings, it should not be stricken under Rule 12(f)." *Id.* The moving party seeking to strike a pleading has a "demanding burden to show adequate grounds under Rule 12(f)." *Pylant v. Cuba*, No. 3:14-CV-0745-P, 2015 WL 12753669, *5 (N.D. Tex. March 6, 2015).

## DISCUSSION

*a. Whether Plaintiff alleges facts sufficient to establish Article III standing for injunctive and declaratory relief.*

    1.  Parties' arguments

        A.  *Sheriff's arguments*

Sheriff argues that because there are no allegations that Plaintiff is in danger of a real and immediate threat of injury, the Court lacks subject matter jurisdiction to issue an injunction over a hypothetical injury backed by no factual allegations. (Doc. 15-1 at 8-9.) Sheriff contends that "Plaintiff actually notes in the beginning of the complaint that D.B. is no longer in prison [and] then goes on to say that there is only a likelihood of him returning, not that he has returned or for certain will return." (*Id.* at 8.) Without factual allegations that support an immediate danger of the possibility of future harm, not conjectural or hypothetical injury, Sheriff asserts that the Court does not have subject matter jurisdiction over the claim for injunctive and declaratory relief. (*Id.*)

### B. *City/Parish's arguments*

The City/Parish contends that Plaintiff fails to state a claim for injunctive relief because Plaintiff does not allege a "real and immediate" threat of injury. (Doc. 26-2 at 6.) The City/Parish argues that any acts of threats of injury from unforeseeable future acts cannot be attributed to a policy, procedure, or practice of the City/Parish and are merely hypothetical allegations. (*Id.*)

### C. *Plaintiff's response*

Plaintiff argues that the allegations in the *Complaint* satisfy the pleading requirement for Article III standing and that it is not necessary to articulate a specific date of expected future injury to have standing for prospective relief. (Doc. 23 at 3.) Plaintiff provides that in *Friends of the Earth, Inc. v. Laidlaw Environ. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, (2000), the Supreme Court held that the plaintiff had established injury in fact to seek injunctive relief because "members of the plaintiff organizations testified that they used the area close to the defendant's facility for recreational purposes, but no longer did so because of the discharges." (*Id.*)

Plaintiff asserts that the *Complaint's* allegations regarding D.B.'s mental disability and "obsessive and compulsive thoughts about using a telecommunication device to send messages to an individual who he believes has wronged him," along with the fact that D.B. has been arrested twice for improper use of a telephone, are sufficient to show that there is a plausible threat that he will be arrested and encounter the conditions of confinement at the parish prison. (*Id.* at 4 (citing Doc. 1 at ¶¶ 194-198).) Plaintiff maintains it is reasonably foreseeable that D.B. will return to the EBRPP and, without injunctive relief, his needs will not be accommodated. (*Id.*)

Regarding whether the *Complaint* alleges sufficient factual support to satisfy the pleading requirements for Article III standing, Plaintiff states it is not necessary to attach affidavits, medical records, or depositions to the *Complaint* to prove any of his allegations. (*Id.* at 5.)

In response to the City/Parish's arguments, Plaintiff reiterates that D.B. has alleged sufficient facts to state a claim for injunctive relief at the pleading stage. (Doc. 36 at 12.) Specifically, Plaintiff outlines:

> D.B. has already been arrested twice before for improper use of a telephone. D.B. suffers from a mental disability and he continues to have "obsessive and compulsive thoughts about using a telecommunication device to send messages to an individual who be believes has wronged him." While steps have been taken to hopefully curtail further incarceration, given the prevalence of smartphones in modern society, there is the distinct and realistic possibility that D.B. will acquire a new smartphone and that D.B. will use that device to send inappropriate messages and/or voicemails. D.B. has demonstrated, at the pleading stage, that there is a plausible threat that he will again be subject to arrest and will again encounter the conditions of confinement that are the subject of this action.

(*Id.* at 14.) It is therefore not unreasonable to assume that D.B. will be forced to return to the EBRPP and need accommodation from the City/Parish. (*Id.*) As such, Plaintiff argues that the *Complaint* alleges facts sufficient to show Article III standing. (*Id.*)

Plaintiff also argues that the injuries suffered by D.B. were the foreseeable result of the ADA violations committed by the City/Parish because, without the necessary accommodations, D.B. was in a vulnerable state and easily preyed upon by the predatory inmates with which he was housed. (*Id.* at 15.) Further, given the state of medical care and the injuries D.B. has already suffered, the facts alleged in the *Complaint* show that D.B. is at a high risk of injury if, or when, he returns to EBRPP. (*Id.* at 16.) Therefore, Plaintiff contends D.B. has standing to pursue a claim for injunctive relief. (*Id.*)

D. *Sheriff's reply*

In reply, Sheriff argues that the Court does not have subject matter jurisdiction to address the merits of Plaintiff's requested injunctive relief because Plaintiff has not pled a real and immediate threat of injury. (Doc. 33 at 1.) Sheriff distinguishes the cases upon which Plaintiff relies, arguing that in both *Frame v. City of Arlington* and *City of Houston v. Hill*, the plaintiffs demonstrated concrete harms and genuine threats of continued enforcement to justify subject matter jurisdiction. (*Id.* at 2.) In contrast, because D.B. only has a hypothetical future incarceration in the EBRPP, Sheriff maintains there is not a real and immediate injury or threat of injury. (*Id.*)

2. Applicable law

Federal courts are courts of limited jurisdiction, and Article III limits the purview of the Court to "cases" and "controversies." U.S. Const. art. III, § 2. As such, a plaintiff must establish that he has standing to invoke judicial resolution his claim. *Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.") As to the requirements to establish standing, the Supreme Court has explained that:

> the irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. Where, as here, a case is at the pleading stage, the plaintiff must clearly ... allege facts demonstrating each element.

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (internal quotations and citations omitted). Expanding on the elements to establish standing, the Supreme Court further explained, "To establish injury in fact, a plaintiff must show that he or she suffered

an invasion of a legally protected interest that is concrete and particularized and actual or

imminent, not conjectural or hypothetical." *Id.* at 1548 (internal quotations omitted). An injury is

"particularized" when it "affect[s] the plaintiff in a personal and individual way." *Id.* An injury is

"concrete" when it "actually exist[s] . . . [is] real, and not abstract." *Id.* "To obtain standing for

injunctive relief, a plaintiff must show that there is reason to believe that he would directly

benefit from the equitable relief sought. In other words, a plaintiff must face a threat of present

or future harm." *Plumley v. Landmark Chevrolet, Inc.*, 122 F.3d 308, 312 (5th Cir. 1997)

(internal citations omitted).

When considering whether a plaintiff has established standing under the ADA, the Fifth

Circuit has explained:

> Standing to seek injunctive relief requires plaintiffs to show that they suffer or will
> suffer an injury-in-fact, and therefore would benefit from the court's granting of
> such equitable relief. Plaintiffs must demonstrate that they face a palpable present
> or future harm, not harm that is "conjectural or hypothetical."  Allegations of "past
> wrongs" alone do not "amount to that real and immediate threat of injury necessary
> to make out a case or controversy."  Past wrongs can be considered, however, as
> evidence of an actual threat of repeated injury.

*Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 F. App'x 180, 183 (5th Cir. 2015) (internal

citations omitted). Further, the Fifth Circuit has also stated that, "Mere some day intentions—

without any description of concrete plans, or indeed even any specification of *when* the some day

will be—do not support a finding of the actual or imminent injury." *Deutsch v. Travis Cty. Shoe

Hosp., Inc.*, 721 F. App'x 336, 340 (5th Cir. 2018) (internal quotations and citations omitted)

(emphasis in original). The Fifth Circuit summarized the requirements for Article III standing,

detailing:

> To be sure, Article III standing requires a plaintiff seeking injunctive relief to allege
> "actual or imminent" and not merely "conjectural or hypothetical" injury. Mere
> "some day" intentions to use a particular sidewalk, "without any description of
> concrete plans," does not support standing. But "imminence" is an "elastic concept"
> that is broad enough to accommodate challenges to at least some sidewalks that a

disabled person has not personally encountered. For example, a plaintiff may seek injunctive relief with respect to a soon-to-be-built sidewalk, as long as the plaintiff shows a sufficiently high degree of likelihood that he will be denied the benefits of that sidewalk once it is built. Similarly, a disabled individual need not engage in futile gestures before seeking an injunction; the individual must show only that an inaccessible sidewalk actually affects his activities in some concrete way.

*Frame v. City of Arlington*, 657 F.3d 215, 235–36 (5th Cir. 2011) (internal citations omitted).

3. <u>Analysis</u>

The Sheriff and the City/Parish argue that Plaintiff does not have standing to seek injunctive relief because he has not alleged an intent to return to the EBRPP. Plaintiff responds that the *Complaint* alleges sufficient facts to show Article III standing for injunctive relief exists. The Court finds that Plaintiff has alleged facts sufficient to create Article III standing for injunctive relief.

The *Complaint* alleges that there is a high likelihood that D.B. will return to the EBRPP and need adequate accommodation because: (1) D.B.'s disability is permanent; (2) D.B. has been arrested twice in the past year; (3) D.B. continues to have the obsessive compulsive thoughts that led to his prior incarcerations; and (4) it is highly likely that D.B. will be able to access a smartphone and repeat his prior behavior. Therefore, Plaintiff links standing to the continued pattern of obsessive compulsive behavior that has led to his prior arrests, and in which there is a strong probability that D.B. will continue to repeat.

In *City of Los Angeles v. Lyons*, the Supreme Court explained:

Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers. Count V of the complaint alleged the traffic stop and choking incident five months before. That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part. The additional allegation in the complaint that the police in Los Angeles routinely apply chokeholds in situations

16

> where they are not threatened by the use of deadly force falls far short of the allegations that would be necessary to establish a case or controversy between these parties.

461 U.S. 95, 105 (1983). The Supreme Court in *Lyons* relied on *O'Shea v. Littleton*, 414 U.S.

488, 496–97 (1974), which stated:

> Of course, past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury. But here the prospect of future injury rests on the likelihood that respondents will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before petitioners . . . we are nonetheless unable to conclude that the case-or-controversy requirement is satisfied by general assertions or inferences that in the course of their activities respondents will be prosecuted for violating valid criminal laws. We assume that respondents will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners.

*Id.* Following the Supreme Court's holding in *Lyons*, where a plaintiff's standing depends on his

arrest for future illegal activity, the speculative nature of any future illegal activity on the part of

the plaintiff has been found to be insufficient to warrant standing for injunctive relief. *Wilkins-*

*Jones v. Cty. of Alameda*, No. 08-1485 MHP, 2010 WL 2198196, at *3 (N.D. Cal. May 28,

2010) ("The speculative nature of any future arrest, particularly an illegal arrest, is insufficient to

warrant standing for future injunctive relief.").

In addition, as the Honorable Chief Judge Dick of this District recently concluded, when

an inmate is no longer in custody of the agency he sought to enjoin, he may not have standing to

seek injunctive relief. *Carter v. Cain*, No. CV 17-201-SDD-RLB, 2019 WL 846053, at *5 (M.D.

La. Feb. 21, 2019). Chief Judge Dick found

> [W]ith respect to the instant case, Terrance Carter is no longer an inmate at LSP. His mother, who brings this action on his behalf, is not an inmate at LSP, and she pleads no facts suggesting that she faces a "real and immediate" threat of future injury. As such, Plaintiff lacks standing to seek prospective injunctive relief regarding the conditions at LSP, and her claims for prospective injunctive relief against Defendants in their official capacities are hereby dismissed.

*Id.*

17

This case, however, is unlike *Lyons* and *Carter v. Cain* because Plaintiff has alleged specific facts that lead to the inference that D.B. faces a real and immediate threat of future arrest and custody at the EBRPP. The *Complaint* alleges, and the Court finds, a real and immediate threat because Plaintiff's disability involves a specific obsession and compulsion with using a smartphone in a manner that has already led to two arrests within approximately four months. As the Supreme Court found in *O'Shea*, "[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." 414 U.S. at 496. Therefore, given that Plaintiff has alleged facts that support an inference that D.B. is permanently disabled and will *not* be able to overcome the obsessive-compulsive behavior that led to his prior incarcerations, the Court will not assume that D.B. will conduct his activities within the law so as to avoid future arrests. *See Wooley v. Maynard*, 430 U.S. 705, 712 (1977) "The threat of repeated prosecutions in the future . . . and the effect of such a continuing threat on their ability to perform the ordinary tasks of daily life . . . is sufficient to justify injunctive relief.")

Further, as the Fifth Circuit explained in *Frame*, "'imminence' is an 'elastic concept'" . . . a disabled individual need not engage in futile gestures before seeking an injunction" *Frame v. City of Arlington*, 657 F.3d 215, 235–36 (5th Cir. 2011) (internal citations omitted). It would be the definition of a futile gesture for D.B. to again be arrested so that he could pursue injunctive relief. The Court finds that in this case, "imminence" is "elastic" enough to find a real and immediate threat of future injury. As such, the Court holds that Plaintiff has alleged sufficient facts to support Article III standing for injunctive relief and will deny the motions to dismiss on this issue.

b.  *Whether the Complaint alleges sufficient facts to state a claim under the ADA/RA*

1.  Parties' arguments

A.  *Sheriff's arguments*

The Sheriff argues that Plaintiff fails to allege facts that: (1) The Sheriff knew the harm to a federally protected right was substantially likely; (2) failed to act on that likelihood; and/or (3) show disparate treatment. (Doc. 15-1 at 9.) Without these factual allegations, the Sheriff maintains that Plaintiff cannot state a claim under the ADA or RA. (*Id.*)

As to whether the Sheriff had notice of the violation of Plaintiff's rights under the ADA and RA, the Sheriff argues that there are no allegations that Sheriff Gautreaux had knowledge of a violation of D.B.'s rights. (*Id.* at 10.) Without allegations that show that the public entity (or an employee) acted with at least deliberate indifference, the Sheriff maintains that Plaintiff cannot state a claim for intentional discrimination. (*Id.*) The Sheriff states that, contrary to Plaintiff's claim that the EBRPP has a facially discriminatory system that treats inmates on medical lockdown differently than in the general population because of their disability, the facts alleged in the *Complaint* provide that D.B. was able to call Ms. Whaley and shower while housed in medical lockdown. (Doc. 15-1 at 10.)

The Sheriff further contends that Plaintiff's allegations are contradictory as follows:

First, Plaintiff states that the Sheriff failed to reasonably accommodate D.B. by failing to engage in an interactive dialogue with D.B. and Whaley about D.B.'s needs. Prior to this statement, Plaintiff asserts facts of multiple conversations Whaley had with the medical department regarding D.B., and even though the Sheriff does not provide medical treatment, Plaintiff noted conversations with Warden Grimes. Further, the Complaint is thereafter void and silent of any further attempts to speak with Warden Grimes from Whaley or D.B. Second, Plaintiff alleges that the Sheriff failed to screen him for a disability upon his initial acceptance into the EBRPP. However, Plaintiff also pled that as early as the first day of D.B.'s incarceration medical staff had made notations on his health condition, which means D.B was screened upon his acceptance. Third, Plaintiff alleges that the City/Parish and the Sheriff did not adequately investigate the nature, extent, and limitations of D.B.'s disability upon his initial acceptance in EBRPP. However, there are no factual allegations in the Complaint to support this allegation against the Sheriff, and D.B. would have been subjected to questioning upon his arrival at the Parish Prison. Plaintiff, as noted above, even stated that on the first day that medical department had examined him and left notations in his chart.

> Fourth, Plaintiff alleges that City/Parish and Sheriff operate a physical facility with inadequate site lines for the deputies that maintain security. Once again there is no listed factual support for this allegation. However, none of the above four allegations address the duty owed by the Sheriff. These allegations are to be properly made against the medical provider and owner of the building.

(Doc. 15-1 at 11.) The Sheriff also argues that the *Complaint* does not have the factual support to show that Plaintiff was not provided equal access to the showers, telephones, or the possession of personal items. (*Id.* at 12.) Therefore, because of the contradictory allegations in the *Complaint*, and the failure to allege sufficient facts to state a claim under the ADA/RA, the Sheriff argues the Court should dismiss Plaintiff's claims. (*Id.*)

The Sheriff also argues that Plaintiff does not state a claim under the RA, because the *Complaint* provides conclusory allegations with no factual support. (*Id.* at 13.) Further, as to the allegation that there were not reasonable accommodation modifications made on D.B.'s behalf, Sheriff points out to the "multiple phone calls between Whaley and prison medical staff where D.B. was actually moved to 'protective custody' seemingly at Whaley's request." (*Id.* at 13-14.) Because the allegations relating to the claim under the RA are either conclusory or contradicted within the *Complaint*, Sheriff urges that the Court dismiss Plaintiff's claims. (*Id.* at 14.)

    *B.*   <u>*Plaintiff's response to the Sheriff*</u>

        i.   <u>D.B. has adequately pled the elements of claims under Title II of the ADA and the Rehabilitation Act against the Sheriff</u>

Plaintiff argues that D.B. has alleged sufficient facts to show: (1) D.B. has a qualifying disability; (2) D.B. was denied the benefits of programs, services, and activities or otherwise subjected to discrimination; and (3) the discrimination was by reason of D.B.'s disability. (Doc. 23 at 6.)

First, Plaintiff alleges that D.B. has been diagnosed with Asperger's Syndrome and therefore has an autism spectrum disorder. (*Id.*) Plaintiff also alleges and discusses that he is a

"qualified individual with a disability under the ADA, RA and LCHR." (*Id.* (quoting Doc. 1 at ¶ 5.)

Second, Plaintiff alleges that D.B. was denied the benefits of programs and services and otherwise subjected to discrimination because the Sheriff failed to accommodate his disability. (*Id.* at 7.) Specifically, Plaintiff alleges that the Sheriff failed to investigate D.B.'s need for separate housing and treated D.B. the same as a non-disabled inmate, which led to the predatory inmate encounter on the "M line." (Doc. 23 at 7 (citing *Riel v. Electric Data Sys. Corp*,. 99 F.3d 678, 681 (5th Cir.1996) ("By requiring reasonable accommodation, the ADA shifts away from similar treatment to different treatment of the disabled by accommodating their disabilities.") Further, Plaintiff argues that D.B. was treated differently on account of his disability because, as the *Complaint* alleges, he had reduced telephone privileges compared to inmates in the general population. (*Id.* at 8 (citing *Silva*, 856 F.3d at 834).)

Last, Plaintiff argues that the *Complaint* sets forth facts under a failure to accommodate theory and a disparate treatment theory to show that the discrimination D.B. suffered was "by reason of his disability." (*Id.*) Under the failure to accommodate theory, Plaintiff argues:

> On April 16, 2019, D.B.'s mother sent a text message to Suzy Gautreaux, wife of Sid Gautreaux. The next day, April 17, 2019, Ms. Whaley received a phone call from Warden Grimes, who was calling at the direction of Sheriff Gautreaux. Ms. Whaley relayed to Warden Grimes that D.B. "was autistic and could not defend himself physically and had a serious cardiac condition." Warden Grimes responded that the situation was "above my head" and he implied that he was going to have the medical director call Ms. Whaley. Ms. Whaley then spoke to the medical director, who informed Ms. Whaley that D.B. was being moved somewhere "that he would be monitored and watched." Indeed, D.B.'s medical records from April 17 reflect that it was well known that D.B. required housing separate and apart from other inmates, as the notes read "Isolation - single cell (Please place in singled [sic] cell - Offender is Autistic with child like behavior. Can easily be preyed upon.)". The Sheriff then moved D.B. to the "M" line on Wednesday, April 17.

(*Id.* at 8-9 (citing Doc. 1 at ¶¶ 91, 92, 95, 102 and 104-105).) Plaintiff argues that these facts show: (a) the Sheriff had knowledge of D.B.'s disability, and (b) that the City/Parish instructed

D.B. be placed in isolation housing. (*Id.* at 9.) Despite this knowledge, Plaintiff contends the Sheriff's decision to move D.B. closer to the predatory inmates on the M line, failed to accommodate D.B.'s request for accommodation. (*Id.* at 9-10.)

Plaintiff also argues that D.B.'s disability, limitations, and needed accommodations were open, obvious and readily apparent to the Sheriff because "[i]n December of 2018, D.B. was processed at the EBRPP and the Sheriff's office documented that D.B. was "autistic." (*Id.* at 10.) In 2019, when D.B. returned to the EBRPP, the Sheriff knew that D.B. needed special housing, as admitted to Ms. Whaley by Captain White when he stated, "[W]e knew he was autistic and didn't know where to put him." (*Id.* (citing Doc. 1 at ¶ 136).) Plaintiff argues that the Sheriff's choice to put D.B. into the general population, and then onto the M Line—where he was directly adjacent to predatory inmates—without engaging in a good faith interactive process, shows that the Sheriff did not reasonably accommodate D.B.'s disability. (*Id.* at 11.)

In addition, Plaintiff alleges that D.B. was subject to disparate treatment discrimination because D.B. was treated less favorably than others on account of his protected status. (*Id.* (citing *Windhauser v. Bd. of Supervisors for Louisiana State Univ. & Agr. & Mech. Coll.*, 360 F. App'x 562, 565 (5th Cir. 2010)).) Plaintiff argues that D.B. was moved to the M Line on account of his disability and suffered a great reduction of his rights to go to the yard, in making telephone calls, taking a shower, and having access to personal items. Because this is disparate treatment as compared to individuals in the general population, Plaintiff maintains D.B. was subject to discrimination by reason of his disability. (Doc. 23 at 12.) Further, Plaintiff distinguishes *Arce v. Louisiana*, 226 F. Supp. 3d 643 (E.D. 2016) by stating that it ignores the Fifth Circuit's reasoning in *Windhauser* and implores the Court to reject the analysis in *Arce.* (*Id.* at 13.)

      ii.  <u>D.B. had adequate pleaded that the Sheriff committed "intentional discrimination"</u>
<u>and thus, his claim for damages should not be dismissed</u>

Plaintiff argues that at the pleading stage it is not necessary for a plaintiff to prove intent,

only that the plaintiff show that intent is a reasonable inference. (*Id.* at 15.) Under Fifth Circuit

caselaw, Plaintiff argues that a defendant commits intentional discrimination where an employee

of a public entity has knowledge of the plaintiff's disability but chooses not to accommodate.

(Doc. 23 at 15.) Plaintiff contends that the *Complaint* alleges facts that make it plausible the

Sheriff committed intentional discrimination under the ADA/RA. Specifically, after Ms. Whaley

requested an accommodation, "the Sheriff incredibly decided to move D.B. to housing in close

proximity to predatory inmates." (*Id.*) The reasonable inference, Plaintiff maintains, is that the

Sheriff had knowledge of D.B.'s disability and chose not to accommodate. (*Id.* at 15-16.)

      iii.  <u>D.B.'s claim under the Rehabilitation Act is adequately pleaded</u>

Because the claim under the Rehabilitation Act in the *Complaint* incorporates the factual

allegations, and the legal standard for a claim under the Rehabilitation Act is identical, Plaintiff

maintains that the *Complaint* states and adequately pleaded claim under the Rehabilitation Act.

(*Id.* at 16.)

      iv.  <u>The Sheriff's argument that D.B.'s allegations are "contradictory" is not a</u>
<u>recognized basis for a motion to dismiss</u>

Plaintiff acknowledges that the *Complaint* has multiple theories of relief. However,

Plaintiff also asserts that the alternative theories of relief is not a basis for a motion to dismiss

due to any contradictions or inconsistent allegations of fact. (*Id.* (citing Fed. R. Civ. P. 8(d)(3)

("A party may state as many separate claims or defenses as it has, regardless of consistency.")).)

Further, Plaintiff maintains that any "contradiction" outlined by the Sheriff is merely the Sheriff

disagreeing with Plaintiff's theory of recovery. (*Id.* at 17.) As such, Plaintiff states that the Court

should not consider the Sheriff's arguments regarding inconsistent or contradictory pleading. (*Id.*)

> v.  The Sheriff's demand that D.B. prove his case at the pleading stage has no basis in law.

Plaintiff concludes that he is not required to prove his case at the pleading stage and that any arguments that the *Complaint* is merely argument with no factual support or that the *Complaint* does not cite to any evidence miss the mark. Within the confines of *Twombly* and *Iqbal*, Plaintiff only has to set forth a plausible claim for relief. (*Id.* at 18.)

### C. *Sheriff's reply*

As to the claim for intentional discrimination under the ADA/RA, Sheriff reiterates its argument that Plaintiff failed to allege sufficient facts to state a claim. (Doc. 33 at 1.) Specifically, Sheriff argues that the jail provided reasonable accommodation for D.B.'s disability because while he was housed on lockdown, he was never "denied a request to use the telephone, take a shower, possess certain personal items, or have yard time." (*Id.* at 3.) Further, Sheriff maintains that the ADA provides for reasonable, not preferred, accommodation and that the correctional facility is afforded deference in determining that accommodation. (*Id.*) Sheriff also asserts that his function is limited by Louisiana law to be "the keeper" of the parish prison and as such cannot be held accountable for the physical structure, the financing, or the medical care given at the parish prison. (*Id.* at 4.)

### D. *City Parish's arguments in support*

The City/Parish argues that all of the factual allegations in the *Complaint* relate to the day-to-day operations D.B. encountered at the jail, for which the City/Parish does not have responsibility. (Doc. 26-2 at 3.) Instead, the City/Parish states that the Sheriff, as required by state law, performed and oversaw the operations of the jail, and CorrectHealth East Baton

Rouge, LLC ("CorrectHealth") provided all medical service to D.B. (*Id.* at 5.) The City/Parish

argues that neither the Sheriff nor CorrectHealth are employees or representatives of the

City/Parish. (*Id.*) The City/Parish argues that security personnel and medical staff personnel were

the only individuals with whom D.B. had contact at the parish prison or regarding his

incarceration. (*Id.*) Because no City/Parish employee or representative took any action or

inaction, the City/Parish argues that Plaintiff cannot state a claim for discrimination under the

ADA or RA.

     E.  *Plaintiff's response*

        i.  <u>D.B. has adequately pled the elements of claims under Title II of the ADA and the
Rehabilitation Act against the City/Parish</u>

Plaintiff reiterates the arguments raised in its opposition to the Sheriff's *Motion to*

*Dismiss*, namely that the *Complaint* states a claim under the ADA/RA. (Doc. 36 at 3.)

Specifically, as to Plaintiff's claims against the City/Parish, Plaintiff maintains that the

*Complaint* provides:

> excruciating details concerning the medical staff's refusal to evaluate D.B.'s needs
> as a person with a disability, refusal to engage in an interactive dialogue with his
> mother, Ms. Darlene Whaley, and refusal to provide D.B. with the necessary
> auxiliary aids/services and accommodations. On Wednesday morning April 17,
> 2019, Ms. Whaley spoke with the medical director, Ms. Shelly Rushing, about
> D.B.'s disability, his medications, and his need for protective custody. In response
> to Ms. Whaley's information as to the inappropriate nature of the disability-related
> medication that was being given to D.B., Ms. Rushing stated "he is seeing Dr.
> Blanche for a Psych eval and he will probably put him back on it . . . On April 17,
> 2019, the medical staff had notice that D.B.'s medications were not working and
> that D.B. was not sleeping. The medical staff was informed that D.B. would not
> sleep without his disability-related medications. Despite this, D.B. never received
> a full evaluation by Dr. Blanche and was kept on the ineffective medication until
> h[e] left the jail.

(Doc. 36 at 3-4.) In addition, Plaintiff contends that the *Complaint* details that the medical staff

also failed to engage in dialogue about D.B.'s request for accommodation. Plaintiff asserts:

On April 23, 2019, Ms. Whaley called and spoke with Ms. Rushing and she brushed off Ms. Whaley's concerns, claiming that D.B. was "adapting." Instead of evaluating D.B.'s need for further accommodations / auxiliary aids or services, Ms. Rushing blamed D.B. and suggested that he merely was complaining about inability to "watch television and walk around." When Ms. Whaley again called the medical staff on the same day concerning D.B.'s need for a medical evaluation by Dr. Blanche, Ms. Whaley was kept on hold for 45 minutes and Ms. Rushing never came to the phone. Even D.B.'s medical records reflect that a "problem" was opened for D.B.'s psychological / mental health and that this "problem" is still open. Considering that Dr. Blanche only saw D.B. for "all of two minutes" while on the unit to see another inmate, it is unsurprising that D.B.'s mental health needs were not addressed at the EBRPP.

(*Id.* at 4-5.)

The City/Parish's denial of medical care to D.B. and refusal to address his mental health needs underpins Plaintiff's claim for discrimination under the ADA/RA. (*Id.* at 6 (citing *Lonergan v. Florida Dep't of Corr.*, 623 Fed. App'x. 990, 994 (11th Cir. 2015) (finding that plaintiff adequately stated an ADA discrimination claim by alleging "failure of the prison to give the Plaintiff the treatment prescribed by his dermatologist," because plaintiff pled "more than the mere disagreement with his medical treatment"); *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 285–87 (1st Cir. 2006) (finding a triable issue of fact as to whether the defendant prison violated the ADA by failing to give the plaintiff access to his medications, because this "outright denial of medical services" was "so unreasonable as to demonstrate that they were discriminating against him because of his disability"); *Mitchell v. Williams*, No. 6:15-cv-93, 2016 WL 723038, at *3–4 (S.D. Ga. Feb. 22, 2016) ("Plaintiff alleges more than mere disagreement with his medical treatment. Rather, he states that the Department of Corrections has refused to provide him treatment for his Hepatitis C."); *Anderson v. County of Siskiyou*, No. C 10-01428 SBA, 2010 WL 3619821, at *5 (N.D. Cal. Sept. 13, 2010) (finding that the plaintiff stated a cognizable ADA claim by alleging "that Defendants failed to provide [plaintiff] with any access to mental health programs and services," because plaintiff had alleged an "outright denial

of medical services"); *Payne v. Arizona*, No. CV-09-1195-PHX-NVW, 2010 WL 1728929, at *4
(D. Ariz. April 26, 2010) ("[W]here a plaintiff's factual allegations paint a picture of mere
negligence in the provision of medical services, a Title II ADA claim cannot lie. On the other
hand, where they indicate an outright and deliberate denial or refusal of access to medical care
for a qualifying disability, a plaintiff may proceed under Title II."); *McKissick v. County of York*,
No. 1:09-CV-01840, 2010 WL 1930132, at *6 (M.D. Penn. Mar. 19, 2010) (finding plaintiff
stated a cognizable discrimination claim under the ADA by alleging that defendants denied a
decedent his prescribed medications, distinguishing the allegations from those involving medical
negligence)).)

Plaintiff further details that the discrimination was by reason of his disability because: (1)
an accommodation was expressly rejected and not provided; and (2) in the alternative, D.B.'s
disability, limitation, and accommodation were open, obvious, and readily apparent. (*Id.* at 8.)
First, Plaintiff argues that Ms. Whaley's express request of a psychological evaluation, the
distribution of his disability related medication, and moving D.B. into monitored housing was
alleged in the *Complaint*. (*Id.*) In addition, the City/Parish's lack of interactive dialogue and
refusal to provide the requested accommodation shows that the discrimination was by reason of
his disability. (*Id.*). Second, Plaintiff argues that the City/Parish was passive in its approach to
providing adequate accommodation for D.B.'s disability. (*Id.* at 9.) Namely,

> Plaintiff alleges that "The City/Parish … failed to reasonably accommodate D.B.
> by failing to engage in an interactive dialogue with D.B. and Ms. Whaley about
> D.B.'s needs." Further, "The City/Parish … failed to reasonably accommodate D.B.
> by not adequately investigating the nature, extent, and limitations of D.B.'s
> disability upon his initial acceptance into the EBRPP." Ultimately, the City/Parish
> failed to reasonably accommodate D.B. because it accepted him into the its custody,
> knew of his disability, limitations, and need for an accommodation, and nonetheless
> failed to provide him with the necessary disability-related medications,
> physiological assessments, or related auxiliary aids.

(Doc. 36 at 9.)

27

ii. D.B. alleges that the City/Parish is legally responsible for the medical services department at the EBRPP and therefore D.B.'s allegations under the ADA/RA are properly directed at the City/Parish

Plaintiff argues that the City/Parish is legally responsible for the medical services department at the EBRPP, even though CorrectHealth is operating the department, because Title II of the ADA prohibits discrimination "through contractual, licensing, or other arrangements." (Doc. 36 at 10 (quoting 28 C.F.R. § 35.130(b)(1)).) Plaintiff points the Court to *Smith v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist.*, 385 F. Supp. 3d 491, 499 (E.D. La. 2019) and *Esparza v. Univ. Med. Ctr. Mgmt. Corp.*, No. CV 17-4803, 2017 WL 4791185, at *11 (E.D. La. Oct. 24, 2017) in which the Eastern District of Louisiana found that public entities with the responsibility to provide services may be responsible for alleged discrimination under Title II of the ADA.

Plaintiff therefore maintains that "given D.B.'s allegations and the applicable legal framework, the City/Parish is responsible for any discrimination at the medical services department of the EBRPP" because the City/Parish is the "political entity which owns and is responsible for the East Baton Rouge Parish Prison." (Doc. 36 at 10-11.) As such, Plaintiff asserts, "[t]hat CorrectHealth is presently operating the medical services department on behalf of City/Parish is irrelevant because the City/Parish is responsible for any discrimination in violation of ADA and § 504, even if that discrimination occurs 'through contractual, licensing, or other arrangements.'" (*Id.* at 11 (citing 28 C.F.R. § 35.102(a); 28 C.F.R. § 41.51(b)(1)).)

2. Applicable law

A prisoner may bring claims against their jailors for disability discrimination under Title II of the ADA and Section 504 of the RA. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209–10 (1998); *see also, e.g.*, *Frame v. City of Arlington*, 657 F.3d 215, 224–25 (5th Cir. 2011). Indeed, the Fifth Circuit has made this point crystal clear: "[T]he ADA plainly covers state institutions

28

without any exception that could cast the coverage of prisons into doubt." *Hall v. Thomas*, 190

F.3d 693, 696 (5th Cir. 1999) (quoting *Yeskey*, 524 U.S. at 209). Some eight years after *Yeskey*,

the Supreme Court itself again endorsed this construction. *United States v. Georgia*, 546 U.S.

151, 159 (2006) ("[I]nsofar as Title II [of the ADA] creates a private cause of action for damages

against the States for conduct that actually violates the Fourteenth Amendment, Title II validly

abrogates state sovereign immunity."); *accord Tennessee v. Lane*, 541 U.S. 509, 533-534 (2004).

Title II prohibits discrimination by "public entities," 42 U.S.C. § 12131(1), and state

prisons fall squarely within this statutory definition. *Yeskey*, 524 U.S. at 210. "Title II of the

ADA provides that '[n]o qualified individual with a disability shall, by reason of such disability,

be excluded from participation in or be denied the benefits of the services, programs, or activities

of a public entity, or be subjected to discrimination by any such entity.'" *Lightbourn v. Cty. of El

Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997) (citing, 42 U.S.C. § 12132). As the Fifth Circuit

recently explained:

> To establish a prima facie case of discrimination under the ADA, a plaintiff must
> demonstrate: (1) that he is a qualified individual within the meaning of the ADA;
> (2) that he is being excluded from participation in, or being denied benefits of,
> services, programs, or activities for which the public entity is responsible, or is
> otherwise being discriminated against by the public entity; and (3) that such
> exclusion, denial of benefits, or discrimination is by reason of his disability. *Melton
> v. Dall. Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004). The Supreme
> Court has held that modern prisons conduct many "services, programs, or
> activities" that confer "benefits" on inmates, such as recreational activities, medical
> services, and vocational programs. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210,
> 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998).

*Smith v. Harris Cty., Texas*, 956 F.3d 311, 317 (5th Cir. 2020)

Although the ADA's reasonable accommodation requirement does not apply under Title

II, its "reasonable modifications" requirement—"A public entity shall make reasonable

modifications in policies, practices, or procedures when the modifications are necessary to avoid

discrimination on the basis of disability, unless the public entity can demonstrate that making the

modifications would fundamentally alter the nature of the service, program, or activity," 28

C.F.R. § 35.130(b)(7); *PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001)—has been held to apply

in the prison context. *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014). This distinction

has two consequences. Overall, the ADA "does not require prisons to provide ***new*** services or

programs for disabled prisoners." *Borum v. Swisher Cty.*, No. 2:14-CV-127-J, 2015 U.S. Dist.

LEXIS 8628, at *21, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015) (emphasis added).

However, these same entities "do have an affirmative obligation to make reasonable

modifications . . . so that a disabled prisoner can have meaningful access to ***existing*** public

services or programs." *Id.* (emphasis added).

> As the Fifth Circuit laid out:
>
> "To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015). Plaintiffs ordinarily satisfy the knowledge element by showing that they identified their disabilities as well as the resulting limitations to a public entity or its employees and requested an accommodation in direct and specific terms. *Windham*, 875 F.3d at 237. "When a plaintiff fails to request an accommodation in this manner, he can prevail only by showing that 'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents." *Id.* (quoting *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)).

*Smith*, 956 F.3d at 317–18. "The ADA provides for reasonable accommodation,

not preferred accommodation. The accommodation of the inmate's disability need not be ideal;

instead, it need only be reasonable and effective.  Further, a correctional facility is afforded

deference in its determination of an appropriate accommodation." *Arce v. Louisiana*, 226 F.

Supp. 3d 643, 651 (E.D. La. 2016).

A plaintiff can recover compensatory damages under Title II of the ADA and § 504 of the

RA, if he can prove intentional discrimination under the third prong. The Fifth Circuit has held

that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA and the RA. *See, e.g.*, *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669 (5th Cir. 2004); *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014). No requirement for a showing of an intentional harm has yet been appended to either statute by other circuits. *E.g.*, *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012); *Powers v. MJB Acquisition Corp.,* 184 F.3d 1147, 1153 (10th Cir. 1999). The Fifth Circuit recently explained

> Even when plaintiffs successfully prove a disability-discrimination or a failure-to-accommodate claim, they "may only recover compensatory damages upon a showing of intentional discrimination." *Delano-Pyle*, 302 F.3d at 74; *accord Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 574 (5th Cir. 2018). Our precedents have not "delineate[d] the precise contours" of this showing, but we have relied "on the widely accepted principle that intent requires that the defendant at least have actual notice." *Miraglia*, 901 F.3d at 575. Unlike other circuits, we have not held that deliberate indifference suffices. *Id.*; *see also S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262-63 (3d Cir. 2013) (collecting, and agreeing with, cases from five other circuits).

*Smith v. Harris Cty., Texas*, 956 F.3d 311, 318 (5th Cir. 2020)

The Court observes that in case after case, "the Fifth Circuit has held that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA." *Hacker v. Cain*, 2016 U.S. Dist. LEXIS 73014, at *40, 2016 WL 3167176, at *13 (M.D. La. June 6, 2016) (citing *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir.2004), and *Garrett v. Thaler*, 560 F. App'x. 375, 382 (5th Cir. 2014)). As one court explained, "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners." *McCoy v. Tex. Dep't of Crim. Justice*, No. C–05–370, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006); see also *United States v. Georgia*, 546 U.S.

151, 157 (2006). In fact, "where the defendant otherwise had knowledge of the individual's disability and needs but took no action," not even the failure to expressly request a specific accommodation (or modification) fatally undermines an ADA claim. *Greer v. Richardson Indep. Sch. Dist.*, 472 F.App'x. 287, 296 (5th Cir.2012); *see also Borum v. Swisher Cty.*, No. 2:14–CV–127–J, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015); *Hinojosa v. Livingston*, 994 F. Supp. 2d 840, 843–44 (S.D. Tex. 2014).

Applying the intentional discrimination prong, the Fifth Circuit explained in a recent case,

> Although a closer question, a jury could also reasonably determine that the County's refusal to accommodate Cadena constituted intentional discrimination. Cadena was admitted in a wheelchair, which she contends was taken away by jail staff. A few hours later, she attempted to walk on crutches in the presence of two County employees and was too unstable to do so. The record shows that the employees were aware that the crutches were unsafe because they obtained a wheelchair and wheeled Cadena the rest of the way to the clinic. And two days later, the County medical staff agreed that Cadena required a wheelchair. Further, Cadena testified that, once at the clinic, she requested a wheelchair, but the nurse who saw her denied the request because the facility did not have space for a person in a wheelchair. Finally, the same employee who had seen Cadena fall while using crutches two days earlier then required Cadena to not only use crutches, but also to carry a tray on crutches, in order to eat.

> These facts are analogous to those in *Delano-Pyle* and *Perez*, in which defendants continued to refuse the requested accommodation despite indications that further accommodation was necessary. *Delano-Pyle*, 302 F.3d at 575–76; *Perez*, 624 F. App'x at 185. . . . The County clearly had wheelchairs at its disposal because Cadena was admitted in a wheelchair and she was allowed to use one to travel to the clinic on her first day. A jury could find, therefore, that its ongoing refusal to let her use a wheelchair or to otherwise modify its policies was intentional.

*Cadena v. El Paso Cty.*, 946 F.3d 717, 726 (5th Cir. 2020).

3. Analysis

A. *The Complaint states a prima facie claim under the ADA/RA for intentional discrimination*

The Sheriff argues that Plaintiff does not allege facts sufficient to state a claim for intentional discrimination under the ADA/RA. Plaintiff argues that the *Complaint* states a claim because both the Sheriff and the medical staff knew D.B.'s disability and limitations and intentionally refused to provide accommodation. Taking all factual inferences in favor of Plaintiff, the Court concludes that the *Complaint* states a claim under the ADA/RA for intentional discrimination against the Sheriff.

First, to the extent that the Sheriff argues that the Court should dismiss the *Complaint* because the facts alleged are contradictory, the Court does not agree. The Federal Rules of Civil Procedure allow a plaintiff to allege facts in the alternative. Rule 8(d)(3) states, "A party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). The Court will not dismiss the *Complaint* because Plaintiff has alleged somewhat contradictory theories of liability in support of his claims.

The Court next turns to the Sheriff's arguments that Plaintiff does not state a claim for intentional discrimination because the *Complaint* fails to allege facts that: (1) The Sheriff knew the harm to a federally protected right was substantially likely; (2) failed to act on that likelihood; and/or (3) show disparate treatment. (Doc. 15-1 at 9.) The Court does not agree with the Sheriff.

As previously discussed, intentional discrimination under the ADA/RA requires a plaintiff to allege "that the defendant at least have actual notice of a violation." *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 575 (5th Cir. 2018). Plaintiff alleges that the Sheriff failed to accommodate D.B.'s disability by deciding to first place him in the general population and then move him to the M Line. The *Complaint* alleges that not only did Sheriff

33

Geautreax himself have actual notice that D.B. was autistic and needed to be in isolation because of his disability, but also that Warden Grimes was aware and that other Sheriff's office staff were aware.

As the Fifth Circuit states,

In the context of a failure-to-accommodate claim, intentional discrimination requires at least actual knowledge that an accommodation is necessary. *See Cadena*, 946 F.3d at 724 ("[T]his court has affirmed a finding of intentional discrimination when a county deputy knew that a hearing-impaired suspect could not understand him, rendering his chosen method of communication ineffective, and the deputy made no attempt to adapt."). If a defendant attempts to accommodate a disability, then intentional discrimination requires knowledge "that further accommodation was necessary." *Id.* at 726.

*Smith*, 956 F.3d at 319. In this case, Plaintiff has alleged facts to show that the Sheriff had at least actual knowledge that an accommodation was necessary. Further, the *Complaint* alleges facts to show that while the Sheriff attempted to accommodate D.B. by moving him to the M Line, the Sheriff knew that further accommodation was necessary to actually isolate D.B. from others who might take advantage of his child-like capacity and ease of manipulation. For example, the *Complaint* alleges that medical staff recommended to the Sheriff upon D.B.'s arrival at the EBRPP that he be placed in isolation. Further, the *Complaint* alleges that after the sexual assault occurred, Captain White stated, "When he came in we knew he was autistic and didn't know where to put him but now we are moving him to a cell behind a wall where the deputies do their paperwork and he will be monitored by a deputy 24/7." (Doc. 1 at ¶¶ 135-136.)

Taking all inferences in favor of Plaintiff, the Court concludes that the *Complaint* alleges that the Sheriff had actual notice that a violation of D.B.'s rights under the ADA and the RA was substantially likely if placed with other inmates on the M Line, and failed to act on that likelihood.

The *Complaint* likewise states a claim under the disparate treatment theory for intentional discrimination under the ADA/RA. The *Complaint* alleges that by not differentiating between individuals placed on the M Line for reason of their disability and those on the M Line for disciplinary purposes, the Sheriff provided disparate treatment to disabled individuals on the M Line by restricting access to showers, telephone calls, and personal items. The Sheriff argues that D.B. was able to access the telephone and does not allege that he was stopped from going to the shower. "A failure-to-accommodate claim under the ADA is distinct from a claim of disparate treatment and is analyzed separately under the law." *Anderson v. Harrison Cty., Miss.*, 639 F. App'x 1010, 1016 (5th Cir. 2016) (quoting *Bridges v. Dep't of Soc. Servs.,* 254 F.3d 71, 71 n. 1 (5th Cir.2001) (unpublished); *accord E.E.O.C. v. LHC Grp.,* 773 F.3d 688, 703 n. 6 (5th Cir.2014)). The Court finds that the allegations in the *Complaint* are sufficient to show that disabled inmates on the M Line were treated differently than those inmates in the general population by reason of their disability and that this amounts to disparate treatment. *See Borden v. Fort Bend Cty., Texas*, No. CV H-19-551, 2019 WL 6344473, at *13 (S.D. Tex. Nov. 27, 2019) ("[Plaintiff] claims she was placed in a disciplinary cell solely due to her disability and thus treated differently than inmates who are not disabled. The motion to dismiss the ADA claims against the County is DENIED.")

Last, to the extent that the Sheriff argues that the *Complaint* fails to state a claim under the Rehabilitation Act, the Court does not agree. Section 504 of the RA protects qualified individuals from discrimination on the basis of disability by entities receiving financial assistance from any federal department or agency. 29 U.S.C. § 794 *et seq.* Passed in 1973, the ADA expanded upon its protections. Naturally, therefore, the same prima facie case can be made by a disabled plaintiff under both acts, *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045

(9th Cir. 1999), and courts readily "examine cases construing claims under the ADA, as well as [S]ection 504 of the Rehabilitation Act, because there is no significant difference in the analysis of rights and obligations created by the two Acts." *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002). The Court will therefore deny the *Sheriff's Motion* as it pertains to the failure to state a claim for intentional discrimination under the ADA/RA.

    A.   *The City/Parish is legally responsible for providing medical care at the EBRPP, and the Complaint adequately states a claim for discrimination against the City/Parish*

The City/Parish argues that because CorrectHealth provides medical care at the EBRPP and the Sheriff is the keeper of the jail under Louisiana law, Plaintiff's allegations against the City/Parish fail because CorrectHealth and the Sheriff are not employees or representatives of the City/Parish. Plaintiff asserts that under Louisiana law and Title II of the ADA, the City/Parish is legally responsible for the medical services department at the EBRPP, even though CorrectHealth is operating the department.

The Court agrees with Plaintiff that Title II of the ADA prohibits discrimination "through contractual, licensing, or other arrangements," and that the City/Parish cannot escape liability under the ADA because it has contracted with CorrectHealth to provide medical care at the EBRPP. 28 C.F.R. § 35.130(b)(1). As the Eastern District of Louisiana explained in *Smith v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist.*, "The regulations implementing the ADA provide Title II 'applies to all services, programs, and activities provided or made available by public entities.'" 385 F. Supp. 3d 491, 498–99 (E.D. La. 2019). "The guidance interpreting this section clarifies that '[a]ll governmental activities of public entities are covered, even if they are carried out by contractors.'" *Id.*

As referenced by the Eastern District of Louisiana, the Department of Justice's publication *Guidance to Revisions to ADA Regulation on Nondiscrimination on the Basis of*

*Disability in State and Local Government Services*, is particularly persuasive. In relevant part, the

Department of Justice states:

> The Department is aware that some public entities are confused about the applicability of the title II requirements to correctional facilities built or run by other public entities or private entities. It has consistently been the Department's position that title II requirements apply to correctional facilities used by State or local government entities, irrespective of whether the public entity contracts with another public or private entity to build or run the correctional facility. The power to incarcerate citizens rests with the State or local government, not a private entity. As the Department stated in the preamble to the original title II regulation, ''[a]ll governmental activities of public entities are covered, even if they are carried out by contractors." 28 CFR part 35, app. A at 558 (2009). If a prison is occupied by State prisoners and is inaccessible, the State is responsible under title II of the ADA. The same is true for a county or city jail. In essence, the private builder or contractor that operates the correctional facility does so at the direction of the government entity. **Moreover, even if the State enters into a contractual, licensing, or other arrangement for correctional services with a public entity that has its own title II obligations, the State is still responsible for ensuring that the other public entity complies with title II in providing these services**.

28 CFR § 35, app. A at 645 (2010) (emphasis added). Pursuant to this clause, the Court agrees

with Plaintiff that the local and state laws impose responsibility upon the City/Parish for medical

care at the EBRPP. Furthermore, the duties of the City/Parish with respect to the parish prison are

defined in Louisiana Revised Statutes 15:703, which states that the governing authority of the

parish is responsible for appointing a physician or contracting with a healthcare provider to

provide healthcare in the parish prison.

 The City/Parish, as required by Louisiana law, contracted with CorrectHealth to provide

healthcare at the EBRPP. However, because Title II of the ADA applies to the public entities

responsible for providing the services, Plaintiff's claims under the ADA/RA are properly brought

against the City/Parish. The *City/Parish's Motion* is therefore denied.

*c. Whether allegations should be struck from the Complaint*

 1. <u>Parties arguments</u>

A.  *The City/Parish's arguments*

The City/Parish moves to strike numerous paragraphs from the Plaintiff's pleadings, claiming that the complained-of paragraphs are irrelevant, immaterial, create a "strong likelihood of jury confusion," generate prejudice, and offer no probative value. (Doc. 26-2 at 7.)

First, the City/Parish contends that the Plaintiff's use of the word "dysfunctional" (in Paragraphs 27, 59, 60, 68, 69, 70, 71, and 73) as a descriptor offers no probative value, but instead merely seeks to generate prejudice and embarrass the City/Parish. Additionally, City/Parish claims that Plaintiff is attempting to make unwarranted criticisms of the City/Parish's Public Records Department. (*Id.*) Next, the City/Parish contends that the allegations in Paragraphs 35, 36, and 41-58 are immaterial because the allegations therein occurred between the years 2014-2017, whereas in contrast, the Plaintiff's detention at the EBRPP did not begin until December 2018. (*Id.*) Additionally, the City/Parish avers that the allegations contained in those paragraphs are immaterial because in January of 2017, CorrectHealth assumed the role of medical care, replacing City/Parish as provider. (*Id.*) Therefore, according to City/Parish, the allegations contained within these paragraphs not only pre-date the Plaintiff's detention, they also pertain to a different medical care provider than the provider with whom he dealt. (*Id.*) Accordingly, City/Parish contends that any assertions made by City/Parish employees or representatives during the 2014-2017 time period are irrelevant and offer no probative value. (*Id.* at 8). Likewise, City/Parish contends that any third-party report from that time period is irrelevant. (*Id.*)

Last, City/Parish once again argues Paragraph 67 is prejudicial, irrelevant, misleading, and taken out of context. (*Id.* at 8-9). Paragraph 67 of the Complaint pertains to an interrogatory answered during a separate suit regarding the Prison's compliance, or lack thereof, with the American with Disabilities Act (ADA) and the Rehabilitation Act (RA) for wheelchair mobility.

38

(*Id.*) City/Parish contends that "[t]he interrogatory was limited to 'individuals with disabilities who rely on wheelchairs for mobility.'" (*Id.* at 9). Accordingly, City/Parish argues that the scope of that line of questioning is irrelevant to the current case, and that the piecemeal extraction of interrogatories from an unrelated case serves no purpose other than to mislead the factfinder. (*Id.*)

### B. *Plaintiff's response*

Plaintiff argues that the allegations in the *Complaint* are relevant and germane to D.B.'s causes of action and should not be struck. Plaintiff is left somewhat astonished that City/Parish would attempt to prescribe the language that Plaintiff can or cannot use in its *Complaint*, when, according to Plaintiff, it is appropriate, accurate, and "perhaps[] an understatement." (Doc. 36 at 17.) Supporting this claim, Plaintiff cites the Cambridge Dictionary, which defines dysfunctional as a "failure to operate or work well," and "notably deficient." (*Id.*) Plaintiff contends that the EBRPP only meets 36% of its staffing needs, and that its medical care is so insufficient that it "necessitates the need for 'an immediate plan for implementation of changes to meet standards of care and minimize risk.'" (*Id.*) Therefore, Plaintiff seeks to use the word dysfunction, not to prejudice a factfinder or embarrass City/Parish, but rather to accurately portray its claims. (*Id.*) Moreover, Plaintiff claims no desire to criticize the City/Parish's Records Department, but rather sent a request for the public records prior to initiating suit simply to ascertain City/Parish's policies regarding accommodations for individuals with autism—which, Plaintiff claims, is directly relevant to its request for injunctive relief. (*Id.* at 17-18.)

As to the City/Parish's claims that the allegations of paragraphs 35, 36, and 41-58 are irrelevant because they pre-date Plaintiff's detention, Plaintiff argues that relevance is an issue for summary judgment or a motion *in limine*—not a motion to strike. (*Id.* at 18.) Should the Court find otherwise, Plaintiff nonetheless contends that the Fifth Circuit has found time-barred

incidents to "'illuminate current practices which, viewed in isolation, may not indicate discriminatory motives.'" (*Id.* (citing *Cortes v. Maxus Exploration Co*., 977 F.2d 195, 199-200 (5th Cir. 1992)).) Moreover, Plaintiff cites a Sixth Circuit District Court to show that "'[c]ourts typically will permit discovery in employment discrimination cases to cover a reasonable number of years before and after the alleged discrimination.'" (*Id.* at 18 (citing *E.E.O.C. v. Autozone, Inc.*, 258 F. Supp. 2d 822, 831 (W.D. Tenn. 2003)).) Plaintiff contends that five years is the "reasonable number of years" standard that "some courts have followed." (*Id.* at 18.) Accordingly, it is Plaintiff's belief that the allegations contained within paragraphs 35, 36, and 41-58, though pre-dating his detention, nevertheless paint a more accurate picture of the alleged dysfunction and discrimination of which he was a victim. (*Id.*) Therefore, Plaintiff asks the Court to deem the allegations to be relevant and germane to his claim. (*Id.* at 18-19. )

Last, Plaintiff likewise argues the interrogatory at issue in Paragraph 67 to be relevant and germane to his claim. (*Id.* at 19.) Although the interrogatory was in fact regarding wheelchair mobility at the prison, Plaintiff contends that the City/Parish's response to the question opened the door to its current applicability by broadly and affirmatively proclaiming that it "does not provide accommodations to offenders incarcerated at [EBRPP]." (Doc. 26-2 at 8.) Therefore, Plaintiff argues, there is nothing misleading about the inclusion of this interrogatory—it portrays the "blatant refusal to accommodate individuals with disabilities"— and cannot be stricken or disclaimed on account of City/Parish's own answer. (Doc. 36 at 19). Again, Plaintiff maintains that the admissibility of evidence and/or discovery is a matter for summary judgment or motion *in limine* after the facts have been developed and discovery has occurred. (*Id.*)

2. <u>Analysis</u>

As to the allegations in in paragraphs 27, 59, 60, 68, 69, 70, 71, and 73, after reviewing the *Complaint*, the Court concludes that Plaintiff has outlined numerous examples which serve to "minimally support[]" his allegations of dysfunction. (*See e.g.,* Doc. 1 at 6-8.) Further, as to Plaintiff's allegations regarding the record requests, Plaintiff made six different policy inquiries and he received in response the "meager" three documents (*Id.* at 9-10). Although this may in fact be a criticism of the public records department, it is not "unwarranted" as City/Parish suggests. Due to the generally disfavored practice of striking portions of a complaint and the fact that allegations in a complaint are assumed to be true, the allegations in paragraphs 27, 59, 60, 68, 69, 70, 71, and 73 are minimally supported and sufficiently relevant to the claim.

Next, turning to the allegations in paragraphs 35, 36, and 41-58, which pre-date the Plaintiff's detention at EBRPP, the City/Parish asserts that those claims are immaterial, irrelevant, and offer no probative value. However, City/Parish offers no legal support to justify this conclusion or its motion to strike.

In a case arising in the Northern District of Illinois, the defendant moved to strike portions of the complaint referring to discriminatory actions that were time-barred by the ADA. *Carroll v. Chicago Transit Authority*, No. 01 C 8300, 2002 WL 206064, at *1 (N.D. Il. Feb. 8, 2002). Unlike the present case, this plaintiff was trying to assert the "continuing violation doctrine," under which a plaintiff may recover from time-barred acts if they can be reasonably linked to the allowable time frame. *Id.* at *2. The plaintiff conceded that he could not use the time-barred acts to establish a right to recovery, but instead proposed that "the information should remain in the complaint because they show discriminatory intent behind later acts that are not time-barred." *Id.* The court noted that "[e]vidence of discrimination does not lose its relevance" simply because the statute of limitations has run and was thus "admissible to such

issues as unlawful intent." *Id.*  However, the court continued, stating that "the possibility that information may be relevant as evidentiary support at a later stage of the proceeding does not mean that it is properly included in a complaint." *Id.* Because the acts that had become time-barred could not form the basis of plaintiff's claim, the court held that "they do not belong in [the] complaint, whatever their later significance may be," and granted the motion to strike. *Id.*

As Plaintiff notes, the Fifth Circuit has found time-barred incidents to "'illuminate current practices which, viewed in isolation, may not indicate discriminatory motives.'" *Cortes*, 977 F.2d at 199-200 (finding that the district court did not err in considering evidence of time-barred acts in a sexual discrimination suit.); *see United Airlines Inc., v. Evans*, 431 U.S. 553, 558 (1977) (noting that although time-barred acts of workplace, sexual discrimination may no longer have present legal consequences, "[i]t may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue."). These rules, however, relate to evidence, not pleadings.

The City/Parish has the "demanding burden" of showing that a motion to strike is proper. Regarding its contention for paragraphs 35, 36, and 41-58, and the City/Parish fails to cite any legal authority in support.  Based on City/Parish's failure to meet its burden, and the future ability to contest these allegations with a motion for summary judgment or a motion *in limine*, as well as at trial, the motion to strike paragraphs 35, 36, and 41-58 is denied.

Last, regarding the allegation in Paragraph 67, the City/Parish contends that the interrogatory is irrelevant and taken out of context, the Court finds that this contention is likewise unfounded. The interrogatory was obtained when the City/Parish responded to a question directly related to the Prison's obligation to provide reasonable accommodations to its prisoners under the ADA and RA as it relates to wheelchairs. As noted in the *Complaint*, the

City/Parish responded more broadly about all accommodations, suggesting that those decisions were left entirely up to the Sheriff's Office. As such, the City/Parish opened the door to its use by not narrowing the focus of its response. The City/Parish will have the opportunity to object to its evidentiary use with a subsequent motion, have the opportunity to explain itself to a factfinder, or have the opportunity to "complete" the record with other interrogatories or other evidence. Therefore, the Court will not strike Paragraph 67 from the *Complaint*.

In sum, due to the fact that a motion to strike is generally disfavored, should only be granted when the pleading to be stricken has no possible relation to the controversy, should only be granted when the moving party has met its heavy burden of proof, and because these matters may more properly be addressed as evidentiary issues, the City/Parish's motion to strike is denied.

<u>CONCLUSION</u>

Accordingly,

IT IS ORDERED that the *Motion to Dismiss* filed by Sheriff Sid Gautreaux, III (Doc. 15) and the *Motion to Dismiss for Failure to State a Claim; Alternatively, Motion to Strike Allegations within the Complaint, Rec. Doc. 1* filed by the City of Baton Rouge/Parish of East Baton Rouge (Doc. 26) are DENIED.

Signed in Baton Rouge, Louisiana, on August 5, 2020.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

43